# ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOVELY H., GLORIA Q., and MICHELE N.,
on behalf of themselves and all others similarly
situated,

                Plaintiffs,

    -against-

VERNA EGGLESTON, as Administrator/Comm.
New York City Human Resources Administration,

            Defendant.

No. 05 Civ. 6920 (LTS)(AJP)

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 4/19/06
```

## OPINION AND ORDER

APPEARANCES:

THE LEGAL AID SOCIETY
  By: Kathleen Mary Kelleher
      Kenneth Richard Stephens
      Richard Eliot Blum
199 Water St. 3rd Floor
New York, NY 10005

    -and-

MILBANK, TWEED, HADLEY & McCLOY
LLP
  By: Carolyn Walker-Diallo
1 Chase Manhattan Plaza
New York, NY 10005

*Attorneys for Plaintiffs*

THE NEW YORK CITY LAW
DEPARTMENT, OFFICE OF THE
CORPORATION COUNSEL
  By: Martha Anne Calhoun
      Emily Sweet
      Janice Casey Silverberg
100 Church Street
New York, NY 10007

*Attorneys for Defendant*

LAURA TAYLOR SWAIN, United States District Judge

Copies mailed picked up by counsel
Chambers of Judge Swain

In this action Plaintiffs, who assert that they are welfare recipients with disabilities who reside in New York City, seek declaratory and injunctive relief under Title II of the Americans with Disabilities Act (the "ADA"), Section 504 of the Rehabilitation Act of 1974 ("the Rehabilitation Act"), the Due Process Clauses of the United States and New York State Constitutions, and various New York State and City civil rights and social services statutes and regulations, on behalf of themselves and a putative class of New York City welfare recipients with disabilities. Plaintiffs' claims focus on recent changes in the administration of public assistance, food stamps and Medicaid benefits for such persons. They seek an injunction prohibiting further implementation of a New York City Human Resources Administration ("HRA") program under which welfare-related services for recipients who suffer from certain mental or medical conditions (and for other recipients involved in those persons' cases) are to be provided only through three "hub" centers in New York City, rather than through the 29 New York City neighborhood offices that generally administer such services. Plaintiffs argue that this centralization aspect of the program and its involuntary nature violate federal and state laws prohibiting discrimination on the basis of disability and also violate Plaintiffs' due process rights under the Constitution of the United States. Full implementation of the program has been postponed, on consent, pending the briefing and adjudication of Plaintiffs' preliminary injunction application. Plaintiffs have also moved for class certification.

The Court has jurisdiction of the federal constitutional and statutory claims raised in this matter pursuant to 28 U.S.C. §§ 1331 and 1343 and, as explained in section II below, also has supplemental jurisdiction over the related state and local law claims. The Court has considered thoroughly the parties' voluminous written evidentiary and argumentative submissions, as well as the

oral arguments of counsel. This opinion, which addresses the pending motions for class certification

and for a preliminary injunction, constitutes the Court's findings of fact and conclusions of law in

accordance with Federal Rules of Civil Procedure 52 and 65. For the reasons that follow, Plaintiffs'

motion for class certification is granted and Plaintiffs' motion for a preliminary injunction is granted to

the extent it seeks to require Defendant to offer class members an opportunity to opt out of certain

aspects of the contested program.

## BACKGROUND

The general background of this matter, and the Court's findings as to the factual

issues material to its determination of the pending motions, are as follows. Defendant Verna

Eggleston is sued in her official capacity as the Commissioner of HRA, which is the executive agency

responsible for the operation and administration of public assistance programs for residents of New

York City. Named Plaintiff Lovely H. is a woman living in Queens who suffers from anxiety and

Major Depressive Disorder, and whose only sources of support are public assistance, Food Stamps

and Medicaid. Named Plaintiff Gloria Q. is a woman living in Queens who suffers from Major

Depressive Disorder and back pain due to degenerative joint disease and who is the recipient of cash

assistance, Food Stamps and Medicaid. Named Plaintiff Michele N. is a woman living in Howard

Beach (a section of Queens) who suffers from Major Depressive Disorder and anxiety and who

receives public assistance, Food Stamps and Medicaid.

In early 2005, HRA began to implement a new program, called the Wellness,

Comprehensive Assessment, Rehabilitation and Employment ("WeCARE") program, which is

"designed to offer comprehensive and integrated services to public assistance clients who have

medical or mental health conditions that may affect their ability to work." Defendant's Memorandum

of Law in Opposition to Plaintiffs' Motions for Preliminary Injunction and Class Certification ("Def. Mem.") at 4. WeCARE services are intended to provide specialized, sensitive support and extra resources (including "assistance with job searches, job development skills training, workshops, computer and literacy assistance, simulated work activities, on the job training, internships, post employment support and job retention supports," (id. at 6)) to clients whose employment capabilities are impaired by medical and/or mental health conditions. Clients who either self-identify, or who are identified by HRA, as having mental and/or medical health conditions "that prevent them from participating in traditional work activities are referred by HRA to WeCARE for a complete bio-psychosocial [("BPS")] assessment." Id. at 4-5.

   The BPS assessment is conducted by a contract vendor and "results in a functional capacity outcome and the development of a comprehensive service plan . . . for each client." Id. at 5. Each client who is classified as "temporarily unemployable secondary to unstable medical and/or mental health conditions," "employable with varying degrees of limitations," or "unemployable for 12 months or more," (i.e., anyone not classified as "fully employable"), and any other persons receiving benefits in conjunction with that client's case (whether or not those additional persons have medical or mental impairments), is eligible to receive his or her public assistance and related services through the WeCARE program.[1] Id. Those determined to be eligible for WeCARE are not given the option of declining the transfer of their cases to the program (although, as discussed below, HRA has offered a telephonic information line through which people may request

---

[1]  As of October 2005, 12.7% of the clients who had been assessed were found to be fully employable; 42.7 % were found to be temporarily unemployable secondary to unstable medical and/or mental health conditions; 38.3% were found to be employable with varying degrees of limitations; and 6.2% were determined to be unemployable for 12 or more months. Declaration of Frank Lipton, M.D. ("Lipton Decl.") at ¶ 5.

accommodations, such as retention of their cases at the neighborhood centers). WeCARE program enrollees are required to use one of three dedicated WeCARE "hub" facilities, rather than one of the 29 neighborhood offices that are generally available to other HRA clients, for their in-person interactions with the public assistance system, including annual recertification (i.e., proving that they remain eligible for benefits), correcting errors, resolving emergencies and reporting changes in circumstances, such as births and illnesses.[2] The WeCARE "hub" facilities are located in Manhattan, Brooklyn and the Bronx. All clients who reside in Staten Island, Queens or Manhattan are assigned to the Manhattan center, Bronx residents are assigned to the Bronx center, and Brooklyn residents are assigned to the Brooklyn center. HRA clients who are not in the WeCARE program (or other specialized HRA programs, such as centers for refugees, senior citizens and the homeless (see Transcript of October 31, 2005 Deposition of Gregory Gomez at 11)) are assigned to the neighborhood center closest to the client's home.[3] The special WeCARE services are not

---

[2]     It appears to be HRA's intention that WeCARE clients be able to deal with certain public assistance-related issues, such as changes in circumstances or emergency requests for rent or utilities, by telephone, fax or mail rather than through in-person appearances at HRA facilities. See Def. Mem. at 12. The record indicates, however, that such remote access arrangements are not yet fully in place, or have not been communicated sufficiently to WeCARE staff or clients to enable their effective utilization by persons whose disabilities present barriers to travel. See the Declarations of Linda W. at ¶ 16 and Phyllis F. at ¶ 8, both of whom report she has been required to travel to her hub centers four times in 2005 alone, to address issues such as emergency aid to cover rent arrears, deliver requested documents, evaluation of capability to work and recertification. Linda W. further states that she was told by an HRA representative that she was not allowed to handle some issues, such as an emergency request for rent, via fax (see Declaration of Linda W. at ¶ 12); Phyllis F. testifies that she spent $7.00 to fax a copy of her lease to her case worker but was informed that such copy was never received, and that she ultimately delivered the lease by hand for fear of losing her benefits (see Declaration of Phyllis F. at ¶ 10).

[3]     There are nine neighborhood centers in Brooklyn, nine in Manhattan, six in the Bronx, four in Queens and one on Staten Island. (Plaintiffs' Memorandum of Law in Support of Motions for Preliminary Injunction and Class Certification ("Pl. Mem.") at 3).

available through the neighborhood centers or otherwise to clients who are not assigned to WeCARE.

HRA notified the approximately 18,000 clients who were transferred to WeCARE at the program's inception[4] that they could seek accommodation if traveling to the WeCARE center was "impossible" due to a "medical and/or mental health condition."[5] Id. at 13. Clients who wished to pursue this option were directed to call an HRA telephonic information line (the "Infoline"). After a series of recorded announcements and interactive options, clients who called could reach a live HRA representative.[6] These first-line representatives were not empowered to make assignment changes or grant accommodations. Rather, they were instructed to question the clients about their current means of transport to local centers and encourage self-travel to the WeCARE center by whatever means might be available. Clients who wished to pursue a travel-related objection to the assignment had to be persistent enough to call HRA's Office of Constituent and Community Affairs after calling the Infoline and then get through several layers of telephone representatives to reach an official, at which point they were informed that they had to provide medical documentation of the

---

[4]    Defendant represents that, between October and December 2004, approximately 2,000 individuals were transferred to the Manhattan WeCARE Job Center, 7,000 individuals to the Bronx WeCARE Job Center, and 9,000 to the Brooklyn WeCARE Job Center. See October 31, 2005, Deposition of Gregory Gomez at 64-67. At oral argument on December 13, 2005, Defense counsel acknowledged that the number of people who had been transferred to WeCARE Job Centers before that date was approximately 23,000, and that it is "expected that the program may serve up to 40,000." Dec. 13, 2005 Oral Arg. Tr. at 41.

[5]    At oral argument on February 2, 2006, Defense counsel represented that a revised notice explaining how to request accommodations was being prepared. Feb. 2, 2006 Oral Arg. Tr. at 83.

[6]    The record also includes evidence that some callers were simply never able to get through, either because the number was busy or no one returned their message. See, e.g., Declaration of Amalia D. at ¶ 6.

impairing condition for their request to be considered further.  See Declaration of Barbara Ramirez

Giove at ¶¶ 6-12.  HRA was apparently unable to check its own records for documentation of the

client's condition.[7]  According to Plaintiffs' counsel, by December of 2005 there had been 9,000

calls to the information line, although counsel acknowledged that it cannot be said with certainty

how many related to travel-related requests for changes.  Dec. 13, 2005 Oral Arg. Tr. at 13.[8]

Transfer of the remaining approximately 17,000 WeCARE program-eligible clients (see supra note

4) has been postponed on consent, pending resolution of the instant motion practice.

The evidence presented to the Court in connection with these motions demonstrates

that the hub center assignment of WeCARE participants imposes substantial additional travel burdens,

and consequent barriers to receipt of crucial subsistence benefits, on such persons.  Plaintiffs have

proffered an expert analysis demonstrating that "[t]ravel times to the hub centers were much greater

than travel times to the prior job centers.  For Manhattan, Queens and Staten Island clients currently

assigned to the Manhattan hub center, the travel times more than doubled."  Declaration of Richard

Faust ("Faust Decl.") at 4.  In addition, Plaintiffs have filed eleven declarations by the named

Plaintiffs and other members of the putative class[9] describing HRA's refusal to permit them to attend

---

[7]    At oral argument on February 2, 2006, Defense counsel proffered that it "was a little
difficult [to find the medical documentation previously submitted by clients] with the
prior contractor with the switchover . . . Often documentation we can find is old."
Oral Arg. Tr. at 84.

[8]    In her opposition memorandum, dated November 18, 2005, Defendant asserted that the
Infoline received 623 calls from March 21 to August 31, 2005 in response to the
transfer letters.  Twenty-one of those individuals were granted an accommodation,
consisting of either reassignment to their previous center or a "homebound"
designation.  Def. Mem. at 14-15.

[9]    Pursuant to the protective order in place in this matter, the declarations were filed with
the Court unsigned and using pseudonyms.  However, signed copies were served on
counsel for Defendant.  See April 18, 2006, letter from Plaintiffs' Counsel Kathleen
Kelleher to the Court, docket entry # 61.

to routine benefit maintenance issues at neighborhood centers and to their consequent tortuous and repeated visits to the hub centers. These unrefuted declarations attest to profound physical, psychological, and/or logistical barriers and burdens arising from the declarants' disabilities, as well as to significant financial burdens arising from disability-related barriers to using public transportation to travel to the hub centers. See, e.g., Declaration of Amalia D. (declarant suffers from depression, bipolar disorder, rheumatoid arthritis and asthma; used to travel by taxi to neighborhood center at a cost of $7 each way; cannot take public transportation because of claustrophobia and panic attacks and now has to pay $50 (almost half of her monthly welfare grant) to travel to her hub center); Declaration of Phyllis F. (declarant suffers from emphysema, rheumatoid arthritis, depression and cardiac problems that make it hard for her to walk and climb stairs; used to take the bus to her neighborhood center on Staten Island and now has to travel over 2 hours in each direction to reach the hub center in Manhattan; has to spend the day following such a journey in bed recovering because the subway and ferry trip causes her joints to swell); Declaration of Danielle A. (declarant suffers from bipolar disorder and depression, as well as heart disease, and avoids public transportation because crowded places cause anxiety and traveling causes fatigue; used to attend neighborhood center located a five-minute drive from home and now has to take a cab that costs $40 to get to the hub center in Manhattan); Declaration of Linda W. (declarant suffers from lumbar scoliosis and sciatica, which make it painful for her to walk, sit, stand and climb stairs; used to attend her neighborhood center across the street; is now forced to take the subway to a hub center and must walk up and down approximately 70 stairs en route); and Declaration of Reuben C. (declarant suffers from bipolar disorder and Hepatitis C.; used to take bus to his neighborhood center; would have to be driven to Manhattan hub center by his elderly mother.)

Defendant's expert, Dr. Swati Desai, asserts that the majority of WeCARE clients'

travel time to the WeCARE hub centers is the same or only slightly longer than their travel time from home to their previously assigned center. Declaration of Dr. Swati Desai, dated November 18, 2005 ("Desai Decl."). This evidence fails to rebut Plaintiffs' demonstration of significant travel burdens associated with involuntary assignments to WeCARE centers because it is premised in part on travel time measured from a centralized hub center maintained by HRA through a former program, rather than from the neighborhood offices, and because it does not take into account the physical accessibility of public transportation or the effect of travel phobias or anxiety disorders. See transcript of November 30, 2005 deposition of Dr. Swati Desai at pages 83-84.

Plaintiffs seek certification of a main class and a subclass, and also a preliminary injunction that will "prevent HRA from implementing future involuntary transfers and require the agency to offer an opt out to those who have already been transferred."[10] Plaintiffs' Memorandum of Law in Support of Motions for Preliminary Injunction and Class Certification ("Pl. Mem.") at 2. For the reasons that follow, the Court grants the Plaintiffs' motion for class certification and grants Plaintiffs' motion for preliminary injunction (as narrowed by footnote 8 of their opening brief, see supra note 10).

## DISCUSSION

I. Class Certification Motion

A. *Proposed Class Definitions*

Plaintiffs propose to define their main class as: "[r]ecipients of public assistance,

---

[10]     Plaintiffs' opening brief states that they also seek an injunction to "prevent adverse case actions . . . and correct such actions that have already occurred as a result of the agency's discriminatory practices; and, . . . transfer the named plaintiffs back to their local centers and provide them with reasonable modifications," (Pl. Mem. at 2), but they withdraw these two requests in footnote 8 on page 27 of that brief.

Food Stamps and/or Medicaid in New York City who have a physical, mental or medical impairment within the meaning of the New York State Human Rights Law, N.Y. Exec. Law § 292(21) (McKinney 2005)[,] and who have received or will receive a notice from HRA involuntarily transferring their case to one of three 'hub centers' in Manhattan, the Bronx or Brooklyn." Pl. Mem. at 37. In addition, Plaintiffs propose certification of a subclass that would be "comprised of [such main class] members, each of who[m] (a) has a physical and/or mental impairment that substantially limits one or more major life activities, (b) has a record of such an impairment, or (c) is regarded as having such an impairment." Id. at 38.

## B. *Rule 23(a) and (b)(2) Analysis*

For each proposed class or subclass, Plaintiffs must first demonstrate that the grouping meets the four requirements set forth in Federal Rule of Civil Procedure 23(a): (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class. The party seeking class certification bears the burden of demonstrating that all of the Rule 23(a) requirements have been met. When, as here, the moving party is also seeking to certify a subclass, the moving party must demonstrate that the subclass satisfies all of the Rule 23(a) requirements. See Fed. R. Civ. P. 23(c)(4)(B) ("[w]hen appropriate . . . a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly."). See also Marisol A. v. Giuliani, No. 95 Civ. 10533, 1998 WL 199927 at *4 (S.D.N.Y. Apr. 23, 1998) (noting that "[e]ach subclass must independently meet the requirements of Rule 23(a).").

Additionally, a class action may be maintained only if it qualifies under at least one of the categories provided in Rule 23(b). Plaintiffs here seek certification under Rule 23(b)(2), which permits the maintenance of a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole."

"In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 178 (1974) (internal quotation marks omitted). While the "district court must be persuaded after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied, . . . a motion for class certification is not an occasion for examination of the merits of the case." Caridad v. Metro-North Commuter R.R., 191 F.3d 283, 291 (2d Cir.1999) (citations and internal quotation marks omitted), cert. denied, 529 U.S. 1107 (2000). "Nothing in either the language or history of Rule 23 . . . gives a court any authority to conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action." Id. Moreover, in considering a motion for class certification, a court must assume the truthfulness of the Plaintiffs' allegations. See Shelter Realty Corp. v. Allied Maint. Corp., 574 F.2d 656, 661, n. 15 (2d Cir.1978).

### 1. *Rule 23(a) Requirements*

a). *Numerosity*

Rule 23(a)(1) requires that a proposed class be so numerous that joinder is impracticable. HRA argues that Plaintiffs have failed to carry their burden of demonstrating numerosity and points out that some of the clients assigned to WeCARE are not disabled but are,

rather, assigned simply because their cases are associated with those of persons assigned to WeCARE on the basis of medical or mental health conditions (the Court will refer to such non-disabled WeCARE clients in this opinion as "associated persons"). HRA has admitted, however, that it has classified at least 20,000 clients as eligible for assignment to WeCARE on the basis of self-identification or identification by HRA as suffering from medical or mental health conditions that impair their ability to work. The numerosity requirement thus is clearly met for the main class.

The numerosity requirement is also met for the subclass. Evidence of exact class size is not required by Rule 23; a good faith estimate is sufficient. See Robidoux v. Celani, 987 F.2d 931, 936 (2d Cir. 1993) ("Courts have not required evidence of exact class size or identity of class members to satisfy the numerosity requirement."). Defendants correctly note that Plaintiffs have not specified the exact number of WeCARE clients who would be considered "disabled" under the ADA. However, since limitations on general employability are used to determine WeCARE eligibility and the ADA recognizes "working" as a major life activity whose substantial limitation may bring a person within the purview of the statute,[11] there is reason to believe this number is substantial.[12]

Finally, with respect to both the larger class and the subclass, many of the additional

---

[11]    Under the statute, "[t]he term "disability" means, with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2) (West 2005). The regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (emphasis supplied).

[12]    Indeed, HRA's own evidentiary proffer indicates that 87.2% of those evaluated for WeCARE have been classified as "temporarily unemployable secondary to unstable medical and/or mental health conditions," unemployable for 12 or more months, or employable with varying degrees of limitations. See supra note 1.

factors that the Second Circuit has identified as relevant to Rule 23(a) numerosity and joinder determinations favor certification in this case. "Specifically, consolidating the numerous cases into a single class action serves judicial economy; individuals comprising the class are all economically disadvantaged, 'making individual suits difficult to pursue,' and finally, an injunction requiring defendants to comply with the relevant laws 'could affect all potential class members, and individual suits could lead to potentially inconsistent results.'" Henrietta D. v. Bloomberg, No. 95 CV 0641, 1996 WL 633382 at *13 (S.D.N.Y. Oct. 2, 1996) (citing Robidoux v. Celani, 987 F.2d 931, 935 (2d Cir.1993)).

### b). *Commonality*

Rule 23(a)(2) requires "only that questions of law or fact be shared by the prospective class, although not all questions of law or fact raised need be common." Dura-Bilt Corp. v. Chase Manhattan Corp., 89 F.R.D. 87, 93 (S.D.N.Y. 1981). Here, there are numerous common questions, including whether the Plaintiffs were misled as to their right to request reasonable accommodations, whether they were transferred or are proposed to be transferred into an unlawfully segregated program, and whether the Defendant's notification and information systems, particularly insofar as they relate to reasonable accommodations, were so deficient as to have deprived class members of federal and local law accommodation and program accessibility rights without due process of law. The Second Circuit has approved district court findings of commonality at "high levels of abstraction," such as "whether each child has a legal entitlement to the services of which that child is being deprived . . . [and] whether defendants systematically have failed to provide these legally mandated services." Marisol A. v. Guiliani, 126 F.3d 372, 377 (2d Cir. 1997). Here, the common questions of law and fact are much more concrete, and Plaintiffs

have met their burden.

c). *Typicality*

Typicality "is satisfied when each class member's claim arises from the same course

of events, and each class member makes similar legal arguments to prove the defendant's liability."

In re Drexel Burnham Lambert, 960 F.2d 285, 291 (2d Cir. 1992) (internal citation omitted).

"When it is alleged that the same unlawful conduct was directed at or affected both the named

plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective

of minor variations in the fact patterns underlying individual claims." Robidoux, 987 F.2d at 937-

938. Here, Plaintiffs have met their burden of establishing typicality for both the larger class and

the subclass, as each class member's claims arise from the same course of allegedly unlawful events.

All plaintiffs here claim that their involuntary reassignment to WeCARE "hub" centers violated

their rights to be free from disability-based discrimination and denied them due process of law.

d). *Representativeness*

Defendants do not contest the adequacy of class counsel, but assert that "there are

serious questions as to the adequacy of the individual plaintiffs to represent class interests." Def.

Mem. at 42. They argue that one named Plaintiff might lack standing to sue, as her case was never

transferred to a WeCARE center, and that other named Plaintiffs cannot demonstrate harm as they

have not suffered "adverse case action" as a result of their transfer and have not alleged that they

suffered stigma on account of the transfer.

Defendants' arguments fall short of the mark as to the "representativeness" of the

named plaintiffs, in that "[t]wo factors generally inform whether class representatives satisfy the

Rule 23(a)(4) requirement: '(1) absence of conflict and (2) assurance of vigorous prosecution.'" Robinson v. Metro-North Commuter R.R. Co., 267 F.3d 147, 171 (2d Cir. 2001) (internal quotations omitted). Stated another way, in determining whether representative parties will fairly and adequately protect the interests of the class, courts are simply to determine whether "plaintiff's interests are antagonistic to the interest of other members of the class." Baffa v. Donaldson, Lufkin & Jenrette Sec. Corp., 222 F.3d 52, 60 (2d Cir.2000). Here, Defendant has identified no potential conflicts among class members, and Defendant has conceded that HRA does not question Plaintiffs' counsel's ability to assist Plaintiffs' in conducting a vigorous prosecution. Plaintiffs thus have met the adequacy or representativeness requirement, and all of the other Rule 23(a) requirements as well.

### 2. *Rule 23(b)(2) Requirements*

Plaintiffs proposed class definitions also meet, for both the larger class and the subclass, the requirements of Rule 23(b)(2), which allows for the maintenance of a class action if "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. R. Civ. P. 23(b)(2). "Cases of this nature, alleging systemic failure of governmental bodies to properly fulfill statutory requirements, have been held to be appropriate for class certification under Rule 23(b)(2)." Raymond v. Rowland, 220 F.R.D. 173, 181 (D.Conn. 2004).

### C. *Class Definition Issues*

Defendant argues that Plaintiffs' proposed class definitions are unworkable because

they incorporate statutory concepts of what constitutes disability and thus necessarily require individualized eligibility determinations for each class member. Def. Mem. at 37-40. Defendant also argues that the main class definition – which draws on state anti-discrimination law for its breadth – is inappropriate in this federal action. As to the latter argument where, as here, each class member has also asserted a federal claim (Plaintiffs assert that the alleged deprivations of their state and local law protections against disability discrimination constitute violations of their federal due process rights), the Court can properly exercise supplemental jurisdiction of their state and local law claims. A class definition broad enough effectively to address those claims is certainly within the ambit of Rule 23 in this federal litigation.

Turning back to HRA's first objection to the proposed class definition, the Court finds that the agency's own admitted criteria for WeCARE program designation encompass the protected group sufficiently to eliminate the need for incorporation of the explicit statutory reference. State law prohibits discrimination on the basis of conditions that prevent the exercise of a normal bodily function or are demonstrable by medically accepted diagnostic techniques (see discussion infra page 21 ). Because HRA's designation criteria turn on the presence of medical or mental conditions, a simple reference to WeCARE designation by HRA will suffice to define the main class.

The Court also finds that incorporation of the ADA's definition of disability in the definition of the subclass is both workable and appropriate in this case. Under the ADA, "[t]he term 'disability' means, with respect to an individual-- (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C.A. § 12102(2) (West 2005). The regulations define "major life activities" as "functions such as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (emphasis supplied). As explained above, the WeCARE screening process includes a BPS evaluation of each client designated as potentially eligible for reassignment on the basis of perceived or self-reported medical or mental impairment. This BPS evaluation process results in a classification indicative of the impact of the impairment on the person's ability to work, and gives Defendant a unique insight into the limitations and capabilities of class members, putting it in a position to make informed decisions regarding its conduct in relation to class members to the extent the relief afforded to members of the subclass differs from that ordered in respect to the main class. In addition, disputes as to who is properly in the subclass would likely only arise if an alleged violation is contested as to an individual, rather than as to the whole subclass; resolving such disputes would not be overly burdensome.

Finally, as Rule 23 empowers the Court to revise class definitions in the course of litigation, these definitions can be revisited if they turn out to be insufficiently precise or otherwise inappropriate. The Court will certify a main class consisting of "recipients of public assistance, food stamps and/or Medicaid who have received or will receive a notice from the New York City Human Resources Administration involuntarily transferring their case to one of three 'hub' centers in Manhattan, the Bronx or Brooklyn in connection with the WeCARE program." The Court will also certify a subclass of "main class members who (a) have a physical or mental impairment that substantially limits one or more major life activities within the meaning of the Americans with Disabilities Act of 1990, (b) have a record of such an impairment, or (c) are regarded as having such an impairment."

II. Supplemental Jurisdiction

Under 28 U.S.C. § 1367(a), district courts are granted the authority to exercise supplemental jurisdiction over state or local law claims in an action otherwise brought pursuant to federal question jurisdiction if those claims "are so related to [the federal] claims in the action . . . that they form part of the same case or controversy." The Supreme Court has held that this "so related" standard is met if the state and federal claims "derive from a common nucleus of operative fact" and are "such that [a plaintiff] would ordinarily be expected to try them all in one judicial proceeding." United States Mine Workers v. Gibbs, 383 U.S. 715, 725 (1966).

Here, it is clear that the state and local law claims do indeed derive from a common nucleus of operative fact and thus are so related to the federal claims that they form part of the same case or controversy. The Court will exercise supplemental jurisdiction of Plaintiffs' state and local law claims.

III. Preliminary Injunction Motion

Plaintiffs seek a preliminary injunction that will "prevent HRA from implementing future involuntary transfers and require the agency to offer an opt out to those who have already been transferred." Pl. Mem. at 2.

Ordinarily, a party seeking a preliminary injunction must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Jackson Dairy, Inc. v. H. P. Hood & Sons, Inc., 596 F.2d 70, 72 (2d Cir. 1979). Defendant argues that the merits-assessment component of this standard is heightened in this case because, where a preliminary injunction "seeks to stay governmental action

taken in the public interest pursuant to a statutory or regulatory scheme," the moving party must show "irreparable injury and a likelihood of success on the merits," Bery v. City of New York, 97 F.3d 689, 694 (2d Cir. 1996), not just sufficiently serious questions going to the merits of the action. This higher standard "reflects the idea that governmental policies implemented through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly." Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995). As Plaintiffs are seeking to enjoin the implementation of a government program intended to improve the delivery of services beneficial to needy New Yorkers, the Court agrees with Defendant that this higher standard is appropriate here.

Defendant further argues that Plaintiffs must show not only a likelihood of success on the merits, but a heightened "clear and substantial" likelihood of success, as Defendant argues that the injunction would provide Plaintiffs with "substantially all the relief sought" (see Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996), and Reynolds v. Giuliani, 35 F. Supp. 2d 331, 338 (S.D.N.Y.1999)), and that the injunction sought would alter, rather than maintain, the status quo (see Lincoln Cercpac v. Health and Hospitals Corp., 920 F.Supp. 488 (S.D.N.Y. 1996)). The Court need not resolve today the question of whether this heightened standard of "clear or substantial" likelihood of success is appropriate here, as the Plaintiffs have, for the reasons that follow, demonstrated a substantial likelihood of success on the merits of their claim that the involuntary transfer of WeCARE cases to the hub centers unlawfully segregates class members on the basis of disability.

Plaintiffs argue that Defendant's policy of prohibiting WeCARE-eligible clients from attending to in-person recertifications and other day-to-day public assistance issues at their neighborhood centers, while permitting non-WeCARE-eligible clients to attend to such matters

locally, constitutes prohibited segregation of the disabled and persons associated with them. The Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of this claim under state and federal law.

### A. *Likelihood of Success on the Merits*

### 1. *State Law Segregation Claims*

Plaintiffs assert that HRA's policy of requiring WeCARE-eligible aid recipients to access all of their services and conduct their benefits-related transactions exclusively through the hub centers rather than the neighborhood offices constitutes disability-based discrimination in violation of New York Executive Law § 296(2)(a), which is a provision of the New York State "Human Rights Law"; New York Social Services Law § 331; and New York State Department of Social Services regulations published at N.Y. Comp. Code R. & Regs. tit. 18, §§ 303.1 and 303.5.

Section 296(2)(a) of the state Human Rights Law generally provides that it is an "unlawful discriminatory practice for any person, being the owner, lessee, . . . manager, . . . agent or employee of any place of public accommodation . . ., because of the . . . disability . . . of any person, directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof." "Public accommodation" is defined broadly for purposes of this law to include, inter alia, "establishments dealing with goods or services of any kind, dispensaries, clinics and hospitals." N.Y. Exec. Law § 292(9). While the statutory definition expressly excludes public libraries and certain educational institutions from the covered class of public accommodations, it does not specifically exempt public assistance-related facilities from its scope.

The Social Services statute and regulation upon which Plaintiffs rely include both

general prohibitions of disability-related discrimination in the provision of social services by public authorities and specific prohibitions on the segregation of recipients in connection with such services. Section 331(3) of New York's Social Services Law provides that "[n]o social services district shall, in the exercising of the powers and duties established in this title, permit discrimination on the basis of . . . handicap, in the selection of participants . . . and the separate use of facilities or other treatment of participants." N.Y. Soc. Serv. Law § 331(3) (McKinney 2005). Related regulations provide, in relevant part:

> In the provision of public assistance . . . no social services district or any member of its staff shall, on the basis of . . . handicap: (2) provide any aid, care, services, other benefits or privileges to an individual which are different, or are provided in a different manner, from that provided to others; (3) subject an individual to segregation or separate treatment in any matter related to his receipt of any aid, care, services, other benefits or privileges; . . . (6) deny any individual an opportunity to participate in a program through the provision of services; [or] (7) make distinction in relation to use of physical facilities, intake and application procedures, caseload assignments, determination of the amount and type of aid, care, services and other benefits under the program and use thereof.

N.Y. Comp. Codes R. & Regs. tit. 18 § 303.1 (b)(2), (3), (6), (7) (2005).

New York's Human Rights Law defines a "disability" as "a physical, mental or medical impairment resulting from anatomical, physiological, genetic or neurological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques." N.Y. Exec. Law § 292(21) (McKinney 2005). Deferring to "[t]he clear and controlling authority" of the New York Court of Appeals decision in State Div. of Human Rights v. Xerox Corp., 480 N.E.2d 695 (N.Y. 1985), the Second Circuit has recognized that this definition of "disability" is broader than that contained in the ADA. See Reeves v. Johnson Controls World Servs., Inc., 140 F.3d 144, 154-56 (2d Cir. 1998).[13]

---

[13]    Although Section 331 of the Social Services Law uses the term "handicap" rather than the term "disability," as used in the Human Rights Law, the breadth of the handicap

According to the New York Court of Appeals' decision in <u>Xerox</u>, "[t]ypical disability or handicap statutes narrowly defin[e] ['disability'] in the ordinary sense to include only physical or mental conditions which limit the ability to perform certain activities.  However in New York the term 'disability' is more broadly defined.  The statute provides that disabilities are not limited to physical or mental impairments, but may also include 'medical' impairments.  In addition, to qualify as a disability, the condition may manifest itself in one of two ways: (1) by preventing the exercise of a normal bodily function or (2) by being 'demonstrable by medically accepted clinical or laboratory diagnostic techniques.'" <u>Xerox</u>, 480 N.E.2d at 698 (quoting N.Y. Exec. Law § 292(20)[now 21]).  "Thus, an individual can be disabled under the [Human Rights Law] if his or her impairment is demonstrable by medically accepted techniques; it is not required that the impairment substantially limit that individual's normal activities." <u>Hazeldine v. Beverage Media, Ltd.</u>, 954 F. Supp. 697, 706 (S.D.N.Y. 1997).

Here, the Plaintiffs are clearly disabled as that term is used under New York law.  It is not contested here that the BPS assessment conducted by the HRA vendor uses "medically accepted techniques" to determine whether a client's medical or mental health related work limitations are sufficient to render the client eligible for WeCARE, and that only clients with such limitations and their associated persons are designated to WeCARE.  This state definition of disability does not require that the limitation be substantial, only that it be demonstrable, and it is exactly because HRA

---

nomenclature and its essential similarity to the term "disability" is indicated by a further prohibition in Department of Social Services regulations on utilizing facilities that violate the Human Rights Law. <u>See</u> N.Y. Comp. Codes R. & Regs. tit. 18 § 303.5, which provides that "[a]pplicants for or recipients of public assistance and care may not be placed in or referred to a . . .facility which discriminates on the basis of . . . handicap [in violation of] . . . section 296 of the Executive Law of the State of New York, nor may services be provided which would be supportive of such facility or vendor payments made thereto."

determines that a client has a demonstrable limitation (or is associated with a person who has a demonstrable limitation) that it classifies a client as WeCARE-eligible. Thus, the Court holds that the Plaintiffs have demonstrated a substantial likelihood that they will succeed in establishing that they are disabled persons entitled to protection under the state anti-discrimination law.

As previously explained, the New York Social Services Law and the regulations promulgated thereunder specifically prohibit disability-based segregation and differential treatment in the provision of public assistance. See N.Y. Soc. Serv. Law § 331; N.Y. Comp. Codes R. & Regs. tit. 18 § 303.1 (b)(2), (3), (6), (7) (2005). When they are involuntarily transferred to a hub center, WeCARE-eligible recipients of public assistance, unlike non-disabled residents, are precluded from attending to recertification and other issues through the neighborhood offices. They, and their associated persons, must instead deal with the hub centers on these issues. This distinction in the provision of services turns solely on WeCARE designation which is, itself, based solely on the presence of a disability. The Court finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that this aspect of the WeCARE program violates the anti-segregation and differential treatment provisions of the Social Services Law and regulations. Given the clear indication in the specific anti-segregation provisions of the Social Services Law of the breadth of New York's anti-discrimination policies, the Court finds that Plaintiffs have also demonstrated a substantial likelihood of success on the merits of their segregation claim under the Human Rights Law.

## 2. *Federal Segregation Claim*

The Court also finds that Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that involuntary WeCARE hub transfers violate the ADA-

protected rights of the subclass of members who are disabled within the meaning of that statute.  "The ADA both requires all public entities to refrain from discrimination, see [42 U.S.C.A.] § 12132, and specifically identifies unjustified 'segregation' of persons with disabilities as a 'for[m] of discrimination,' see §§ [42 U.S.C.A.] 12101(a)(2), 12101(a)(5)."  Olmstead v. L.C. ex rel. Zimring, 527 U.S. 581, 583 (1999).  Segregation under the ADA is permitted only in the specific and narrow circumstance where an agency establishes that such segregation is "necessary to provide qualified individuals with disabilities with aids, benefits or services that are as effective as those provided to others."  28 C.F.R. § 35.130(d).  Even then, individuals with disabilities must be granted "the opportunity to participate in services, programs or activities that are not separate or different, despite the existence of permissibly separate or different programs or activities."  28 C.F.R. § 35.130(b)(2). The current WeCARE program clearly violates the mandate that persons with disabilities be given the opportunity to participate in mainstream service delivery mechanisms; accordingly, the Court need not reach at this point the question of whether Defendants have demonstrated the necessity of providing WeCARE-related services through separate facilities.[14]

---

[14]     Defendant argues that injunctive relief should be denied because it is in "substantial compliance" with the integrated-setting mandates of the anti-discrimination statutes. This position appears to be premised to a significant degree on the assignment of associated persons (who are not, presumably, disabled themselves) to the hub centers along with class members.  Even if a program that deliberately identifies and assigns to separate facilities a discrete portion of the population could ever be said to be in substantial compliance with a prohibition on segregation, HRA's factual proffers do not support its argument that the hub centers are not segregated.  Only 10% of the assigned adult clients are non-disabled associated persons (see Cantor Decl. at ¶¶ 13-14) and, as explained above, even those associated persons have been assigned to the hub centers by reason of a finding that the person with whom their case is associated is disabled.  This is nothing short of segregation.  Cf. US v. Yonkers Board of Ed., 837 F.2d 1181, 1219 (2d Cir. 1987), holding that, in a racial segregation context, not all or even most affected persons need be members of a suspect class in order for segregation to occur.

### 3. *Other Claims*

Because Plaintiffs have met the likelihood of success prong of the preliminary

injunction standard as to their state and federal law segregation claims, the Court need not address at

this time their reasonable accommodation and other federal, state and local law discrimination-related

claims or their due process claims.

### B. *Irreparable Injury*

Having found that Plaintiffs have made the requisite substantial showing of likelihood

of success on the merits of their claims, the Court now examines whether or not they have satisfied

the irreparable injury prong of the preliminary injunction standard. A showing of irreparable harm is

the "single most important prerequisite for the issuance of a preliminary injunction." Brown v.

Guiliani, 158 F.R.D. 251, 264 (E.D.N.Y.1994) (quoting Bell and Howell v. Masel Supply Co., 719

F.2d 42, 45 (2d Cir.1983)). "Irreparable harm is an injury that is not remote or speculative but

actual or imminent, and for which a monetary award cannot be adequate compensation." Tom

Doherty Associates, Inc. v. Saban Entertainment, Inc., 60 F.3d 27, 37 (2d Cir. 1995) (citation

omitted).

As explained in the findings of fact detailed above, the evidence before the Court on

this motion is sufficient to establish that travel to the WeCARE centers constitutes a hardship for class

members. Not only will most class members have to travel further in order to reach the WeCARE

hub center they are assigned to than they would have had to travel to reach their neighborhood job

center (see Faust Decl. at 4), but the significance of even relatively small increases in travel time is

magnified in many cases by the physical and mental barriers to mobility that arise from Plaintiffs'

underlying disabilities. The physical and mental trauma suffered by such Plaintiffs cannot be

adequately compensated in money damages, particularly where the day-to-day mobility challenges they face are exacerbated by anxiety as to whether their safety-net welfare benefits will be terminated if they fail to make the journey.  See, e.g., Decl. of Reuben R. at ¶ 8 and Decl. of Phyllis F. at ¶ 7.

The risk of irreparable harm in the form of loss of vital subsistence benefits is high because failure to appear for recertification appointments or to respond to requests for additional information could result in discontinuation of benefits for class members.  The evidence before the Court demonstrates that at least one class member's benefits have already been terminated for failure to conduct in-person transactions at the hub center.  See Declaration of Marliese A. at ¶ 12.  Access to public assistance is of crucial importance to those eligible for it.  See generally Goldberg v. Kelly, 397 U.S. 254 (1970).  "[T]he failure to provide benefits may deprive an eligible recipient of the very means by which to live while he [or she] waits."  Henrietta D. v. Guiliani, 119 F. Supp. 2d 181, 209 (E.D.N.Y. 2000).  For these reasons, the Court finds that the additional travel burdens and obligations imposed by the involuntary WeCARE assignment system put class members at risk of irreparable harm in the absence of injunctive relief.  The evidence of record also demonstrates that HRA's proffer of accommodations through its Infoline system and its stated policy of permitting certain transactions to be conducted by phone, fax or mail are insufficient to protect the class against these risks of irreparable harm.  See supra page 5 and supra note 2.

The propriety of injunctive relief in connection with the involuntary reassignment of class members to the hub centers is underscored by the nature of the violation.  The anti-segregation laws upon which Plaintiffs rely reflect important public policy commitments to equality and access. The statutes and regulations embody strong statements of public policy prohibiting discrimination and differential treatment on the basis of disability.  To permit the continued expansion of the current involuntary program and the continued enforcement of involuntary hub center reassignments

that are already in place pending final adjudication of Plaintiffs' claim for relief would be to turn

back the clock not only for the individual who is denied access to the neighborhood center that

welcomes her able-bodied neighbors, but also for a society that has made tremendous efforts and

strides to improve, rather than constrict, accessibility for and integration of the disabled into all

aspects of mainstream life. (Cf. Westchester Disabled On the Move, Inc. v. County of Westchester,

346 F. Supp. 2d 473, 477 (S.D.N.Y. 2004) (holding that irreparable harm would occur if voters with

disabilities were required to vote at alternative locations or by absentee ballots, and noting that "[t]he

ADA sets forth the standards of accessibility that must be met by various public entities and, as such,

establishes the level of accessibility that disabled individuals can properly expect. Whether its

requirements are met, therefore, provides an appropriate framework for determining whether, in a

given case, disabled individuals seeking injunctive relief are at risk of suffering a harm that the law

recognizes.").


IV.  Relief

For the reasons stated above, the Court grants Plaintiffs' application for class

certification and grants Plaintiffs' motion for a preliminary injunction to the extent that Defendant is

hereby prohibited from reassigning class members' (and their associated persons') cases to the hub

centers involuntarily. Defendant shall within sixty (60) days of today's date offer WeCARE

participants whose cases have already been reassigned to a hub center the option of conducting

through their nearest neighborhood center all of the interactions, and receiving through those offices

all of the services, that are available to non-disabled benefit recipients through those offices.

Defendant shall consult in good faith with Plaintiffs' counsel to formulate appropriate

notification and election procedures and materials to be used in providing the "opt-out" opportunities

contemplated by this injunction. The parties shall file with the Court a joint statement describing the procedures and including the forms of notice proposed to be utilized no later than forty (40) days from the date of this Opinion and Order. Any objections to the procedures or notices, and Defendant's response to such objections, shall be set forth in detail in the filing.

## CONCLUSION

For the foregoing reasons, the Court hereby certifies a main class of Plaintiffs consisting of recipients of public assistance, food stamps and/or Medicaid who have received or will receive a notice from the New York City Human Resources Administration involuntarily transferring their case to one of three hub centers in Manhattan, the Bronx or Brooklyn in connection with the WeCARE program.

The Court hereby certifies a sub-class within the main class, consisting of main class members who (a) have a physical or mental impairment that substantially limits one or more major life activities within the meaning of the Americans with Disabilities Act of 1990, (b) have a record of such an impairment, or (c) are regarded as having such an impairment.

The Plaintiffs' motion for a preliminary injunction is hereby granted to the extent that Defendant is hereby prohibited from reassigning class members' (and their associated persons') cases to the hub centers involuntarily. Defendant shall within sixty (60) days of today's date offer WeCARE participants whose cases have already been reassigned to a hub center the option of conducting through their nearest neighborhood center all of the interactions, and receiving through those offices all of the services, that are available to non-disabled benefit recipients through those offices.

Defendant shall consult in good faith with Plaintiffs' counsel to formulate appropriate notification and election procedures and materials to be used in providing the "opt-out" opportunities

contemplated by this injunction. The parties shall file with the Court a joint statement describing the procedures and including the forms of notice proposed to be utilized no later than forty (40) days from the date of this Opinion and Order. Any objections to the procedures or notices, and Defendant's response to such objections, shall be set forth in detail in the filing. The remaining aspects of Plaintiffs' request for injunctive relief have been withdrawn. See supra note 10.

     SO ORDERED.

Dated: New York, New York
     April 19, 2006

                                 LAURA TAYLOR SWAIN
                                 United States District Judge