**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

LOVELY H., GLORIA Q., and MICHELE N.,
COURTNEY B.,  LAURA S.,  EULA S.,
individually and on behalf of all others similarly
situated,

Plaintiffs,

vs.

VERNA EGGLESTON,[1] as Commissioner of the
New York City Human Resources Administration

Defendant.

**1:05-cv-06920 (VSB)**

**STIPULATION**

1. WHEREAS, by Order dated June 22, 2015, the Court approved the Stipulation and Order of Settlement (the "Settlement") in this matter, which is attached as Exhibit A;

2. WHEREAS, by Order dated July 9, 2019, the Court approved the Stipulation between the parties dated July 2, 2019 extending the Order of Settlement (the "Settlement") in this matter, by amending paragraph 140 of the Settlement by amending the phrase "at the conclusion of forty-eight (48) months following the Effective date" to "at the conclusion of eighty-four (84) months following the Effective date" so that Paragraph 140 of the Settlement read:

> 140. The jurisdiction of this Court over the provisions of this Stipulation shall end at the conclusion of eighty-four (84) months

---

[1] Pursuant to Federal Rule of Civil Procedure Rule 25(d)(1), Commissioner Molly Wasow Park is automatically substituted as a party for claims originally brought against Verna Eggleston, the former Commissioner of the Human Resources Administration.

1

following the Effective Date, unless Plaintiffs move for and are granted an extension pursuant to paragraphs 144 through 147 of this Stipulation. When the Court's jurisdiction ends, all rights and claims arising under the provisions of this Stipulation shall terminate; the provisions of this Stipulation shall be deemed satisfied; all claims arising in the Amended Complaint shall be dismissed with prejudice in their entirety and no further relief in this action shall be sought or granted.

3. WHEREAS, by Order dated June 10, 2022, the Court approved the Stipulation between the parties dated June 8, 2022 extending the Order of Settlement (the "Settlement") in this matter, by amending paragraph 140 of the Settlement by amending the phrase "at the conclusion of eighty-four (84) months following the Effective date" to "at the conclusion of one-hundred and eight (108) months following the Effective date" so that Paragraph 140 of the Settlement read:

140.  The jurisdiction of this Court over the provisions of this Stipulation shall end at the conclusion of one-hundred and eight (108) months following the Effective Date, unless Plaintiffs move for and are granted an extension pursuant to paragraphs 144 through 147 of this Stipulation. When the Court's jurisdiction ends, all rights and claims arising under the provisions of this Stipulation shall terminate; the provisions of this Stipulation shall be deemed satisfied; all claims arising in the Amended Complaint shall be dismissed with prejudice in their entirety; and no further relief in this action shall be sought or granted.

4. WHEREAS, Defendant New York City Human Resources Administration ("HRA") has worked diligently and in good faith to achieve full compliance

with the Settlement and has implemented many of the provisions of the Settlement;

5.  WHEREAS, Defendant HRA is continuing to work to achieve full compliance with the Settlement but despite good faith efforts, has not yet fully implemented all of the provisions of the Settlement;

6.  WHEREAS, the remaining provisions of the Settlement which Defendant HRA has not yet fully implemented are sufficiently significant or recurring as to be systemic and will require a significant amount of time to complete, the parties agree these remaining provisions meet the standard set forth in paragraph 141 of the Settlement; and

7.  WHEREAS, the provisions which Defendant HRA has not yet fully implemented are interdependent with the provisions which it has implemented,

**IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN THE UNDERSIGNED, AS FOLLOWS:**

1.      Amending Paragraph 140 of the Settlement.

The parties agree to amend the paragraph 140 of the Settlement by amending the phrase: "at the conclusion of one-hundred and eight (108) months following the Effective date" to "at the conclusion of one-hundred and thirty-two (132) months following the Effective date" so that Paragraph 140 of the Settlement shall read:

> 140. The jurisdiction of this Court over the provisions of this Stipulation shall end at the conclusion of one-hundred and thirty-two (132) months following the Effective Date, unless Plaintiffs move for and are granted an extension pursuant to paragraphs 144 through 147 of this Stipulation. When the Court's jurisdiction ends, all rights and claims arising under the provisions of this Stipulation shall terminate; the provisions of this Stipulation shall be deemed satisfied; all claims arising in the Amended Complaint shall be

3

dismissed with prejudice in their entirety; and no further relief in this action shall be sought or granted.

Dated: New York, New York
         July 8, 2024

THE LEGAL AID SOCIETY
Law Reform Unit
Civil Practice
49 Thomas Street, 5th Floor
New York, NY 10013

MURIEL GOODE-TRUFANT
Acting Corporation Counsel
  of the City of New York
100 Church Street
New York, NY 10007

/s/ *Emily R. Lundgren*

Emily R. Lundgren
(646) 946-0897
elundgren@legal-aid.org
For Plaintiffs

/s/ *Philip S. Frank*

Philip S. Frank
(212) 356-0886
pfrank@law.nyc.gov
For Defendant

**SO ORDERED, this** 9 **day of** July , **2024**

Vernon S. Broderick
United States District Judge

Exhibit A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

LOVELY H., GLORIA Q., and MICHELE N.,
COURTNEY B., LAURA S., EULA S.,
individually and on behalf of all others similarly
situated,

|                                  Plaintiffs,

- against -

VERNA EGGLESTON,[1] as Commissioner of the
New    York    City    Human    Resources
Administration,

|                                  Defendant.

**STIPULATION AND
ORDER OF
SETTLEMENT**

05 CV 6920 (KBF)

   **WHEREAS**, Plaintiffs commenced this action by filing a class action
Complaint on or about August 3, 2005, alleging, inter alia, that the transfer by the
New York City Human Resources Administration ("HRA") of the public
assistance cases of individuals from their local Job Centers to one of three
specialized centers ("WeCARE hubs" or "hubs") in connection with the
implementation of the Wellness, Comprehensive Assessment, Rehabilitation and
Employment ("WeCARE") program, violated state, federal, and local law;

   **WHEREAS**, Plaintiffs simultaneously moved for class certification
and a preliminary injunction;

   **WHEREAS**, in a decision dated April 19, 2006, the Court certified a
class consisting of "recipients of public assistance, food stamps and/or Medicaid
who have received or will receive a notice from the New York City Human
Resources Administration involuntarily transferring their case to one of three 'hub

---

[1] Pursuant to Federal Rule of Civil Procedure Rule 25(d)(1), Commissioner Steven Banks is
automatically substituted as a party for claims originally brought against Verna Eggleston, the
former Commissioner of the Human Resources Administration.

centers' in Manhattan, the Bronx or Brooklyn in connection with the WeCARE program" and a subclass within the main class of members "who (a) have a physical or mental impairment that substantially limits one or more major life activities within the meaning of the Americans with Disabilities Act of 1990, (b) have a record of such an impairment, or (c) are regarded as having such an impairment," <u>Lovely H. v. Eggleston</u>, 235 F.R.D. 248 (S.D.N.Y. 2006);

       **WHEREAS**, in the April 19, 2006, decision, the Court granted Plaintiffs' Motion for a Preliminary Injunction to the extent that Defendant was prohibited from reassigning Class Members' (and their associated persons') cases to the hub centers involuntarily and Defendant was ordered to offer WeCARE participants already reassigned to a hub center the option of conducting through their nearest neighborhood center all of the interactions available to non-disabled benefit recipients through those offices, <u>id.</u> at 262-63;

       **WHEREAS**, by letter dated May 3, 2006, HRA informed the Court that it intended to close the WeCARE hubs and transfer hub clients to the local center that served their zip code of residence, <u>see</u> letter from Martha Calhoun to Hon. Laura Taylor Swain, May 3, 2006;

       **WHEREAS**, the last hub center was closed in July 2006;

       **WHEREAS**, by Notice of Motion dated August 4, 2006, Plaintiffs moved to amend the Complaint;

       **WHEREAS**, by Memorandum Opinion and Order dated November 15, 2006, the Court granted Plaintiffs' motion to amend the Complaint;

       **WHEREAS**, Plaintiffs filed an Amended Complaint dated December 11, 2006;

       **WHEREAS**, by Stipulation so ordered by this Court on February 3, 2010, the class definition was amended to be:

> recipients of public assistance, food stamps and/or Medicaid who (1) are or will be designated as participants in the WeCARE program or (2) individuals who were part of a case that was designated as "homebound" by HRA and had that designation removed through the posting of an HRA NYCWAY computer Action Code 19HC;

- 2 -

**WHEREAS**, by Stipulation so-ordered by this Court on February 1, 2011, the class definition was further amended to be:

> Individuals who meet one of the following three criteria: (1) individuals who are, were, or will be recipients of public assistance, food stamps and/or Medicaid who are, were, or will be designated as participants in the WeCARE program; or (2) individuals who were recipients of public assistance, food stamps and/or Medicaid who were part of a case that was designated as "homebound" by HRA and had that designation removed through the posting of an HRA NYCWAY computer Action Code 19HC or (3) individuals who are, were, or will be recipients of cash assistance and/or food stamps who have a physical, mental or medical impairment within the meaning of the New York State Human Rights Law § 292(21) and who request to be designated as "homebound" by HRA;

**WHEREAS**, Plaintiffs and Defendant HRA (collectively, "the Parties") previously entered into a Stipulation submitted to the Court dated March 14, 2012, resolving, subject to approval by the New York State Office of Temporary and Disability Assistance ("OTDA"), issues related to Plaintiffs' claims for benefits lost in connection with the implementation of the WeCARE hubs for Class Members with active Cash Assistance cases, and on March 15, 2012, Plaintiffs submitted a Second Motion for Partial Summary Judgment (ECF Doc. No. 164) concerning entitlement to retroactive Cash Assistance benefits for Class Members with closed cases;

**WHEREAS**, in December 2013, the Parties asked the Court to adjourn the scheduled trial to permit the Parties to proceed with a settlement process;

**WHEREAS**, the Parties executed a Stipulation and Order of Partial Settlement dated August 7, 2014 ("Partial Settlement Stipulation"), that resolved Plaintiffs' Second Motion for Partial Summary Judgment regarding claims for retroactive Cash Assistance, SNAP, and Medicaid for Class Members with closed cases;

**WHEREAS**, by Stipulation so-ordered by this Court on September 19, 2014, the Parties agreed to interim treatment of Class Members, specified therein, that has occurred while settlement negotiations on the remaining issues in this action have proceeded (the "Interim Agreement");

WHEREAS, the Court subsequently held a fairness hearing regarding the Partial Settlement Stipulation on October 31, 2014, and, by Order issued on that date, contingently found the Partial Settlement Stipulation to be fair, reasonable, and adequate;

WHEREAS, the Court stated in its October 31, 2014, Order that its approval of the Partial Settlement Stipulation would be effective on November 24, 2014, assuming no objections were received by that date, in accordance with the requirements of the Class Action Fairness Act of 2005;

WHEREAS, by Order dated November 24, 2014, the Court approved the Partial Settlement Stipulation;

WHEREAS, the Parties have continued to negotiate the injunctive relief portion of the settlement of this litigation;

WHEREAS, the Parties desire to resolve the remaining issues raised in this litigation without further proceedings;

WHEREAS, the Parties desire to settle this action on terms and conditions just and fair to all Parties;

WHEREAS, the Parties have conducted extensive, arms-length negotiations to resolve the remaining issues in this action, and have resolved those issues as specified in this Stipulation and Order of Settlement ("this Stipulation");

WHEREAS, HRA is undertaking a number of agency-wide reforms designed to improve access to benefits, increase participation in programs, and minimize unnecessary Negative Case Actions for all HRA clients;

WHEREAS, HRA is undertaking an agency-wide initiative to review and revise its written materials with the goal of improved clarity and simplicity;

WHEREAS, HRA is undertaking a number of initiatives to improve communication between the Agency and its clients, including expanding the modes of communication available such as the ability to transact business remotely;

**NOW, THEREFORE, IT IS HEREBY STIPULATED AND AGREED, BY AND BETWEEN THE UNDERSIGNED, AS FOLLOWS**:

## DEFINITIONS

1. "Autoposting Negative Case Actions" means an HRA computer practice by which a Negative Case Action is imposed automatically, without first requiring a staff member to review relevant information in the case file or to contact the client.

2. "BEV" means the HRA "Bureau of Eligibility Verification."

3. "BPS" means the "Biopyschosocial Assessment" conducted by WeCARE to evaluate a client's functional capacity and ability to participate in work activities.

4. "Cash Assistance" or "CA" means Family Assistance benefits authorized by 42 U.S.C. §§ 601 et seq., 42 U.S.C. § 1320b-7, and 8 U.S.C. §§ 1611 et seq., implemented in New York pursuant to N.Y. Soc. Serv. Law §§ 349 et seq.; and/or Safety Net Assistance benefits provided pursuant to N.Y. Soc. Serv. Law §§ 157 et seq.

5. "Class Member" means an individual who falls within the class definition certified by the Court in <u>Lovely H. v. Eggleston</u>, 05 CV 6920 as amended most recently by Order of the Court dated February 1, 2011:

   > Individuals who meet one of the following three criteria: (1) individuals who are, were, or will be recipients of public assistance, food stamps and/or Medicaid who are, were, or will be designated as participants in the WeCARE program; or (2) individuals who were recipients of public assistance, food stamps and/or Medicaid who were part of a case that was designated as "homebound" by HRA and had that designation removed through the posting of an HRA NYCWAY computer Action Code 19HC or (3) individuals who are, were, or will be recipients of cash assistance and/or food stamps who have a physical, mental or medical impairment within the meaning of the New York State Human Rights Law § 292(21) and who request to be designated as "homebound" by HRA.

6. "Conciliation" means an opportunity to discuss with HRA staff whether an alleged infraction in an HRA-required work activity was "willful" and without "good cause," as provided by N.Y. Soc. Serv. Law § 341.

7. "Conference" is a client-initiated discussion with HRA staff provided by 18 N.Y.C.R.R § 358-2.4.

8. "CRT" means "Clinical Review Team" and refers to a WeCARE review or reassessment of a Class Member's functional capacity and ability to participate in work activities.

9. "Disability Inquiry Methods" means the range of tools used by the Agency to identify individuals who may need RAs for disabilities, including Disability Inquiry Scripts, Learning Disabilities and Cognitive Impairment Screening tools, Mental Health Screening Tools and any such other tools the Agency may adopt in consultation with the Expert Consultant retained pursuant to paragraph 50(b) of this Stipulation.

10. "Disability Insert" refers to a notice informing clients how to request an RA that also serves as a form for that purpose. The current version of the form is HRA-102c (01/26/15), which may be changed by the agreement of the Parties.

11. "DVE" refers to the Diagnostic Vocational Evaluation conducted for Class Members assigned to the VRS track.

12. "Effective Date" refers to the date on which all of the following have occurred:

    a. The Court has so-ordered and entered the Stipulation and Order of Settlement, following notice to the Class and a fairness hearing as prescribed by Rules 23(c)(2) & 23(e) of the Federal Rules of Civil Procedure and compliance with the Class Action Fairness Act, 28 U.S.C. § 1715;

    b. The Court has entered an Order and Final Judgment in this action, and 30 days have passed after entry of the Order and Final Judgment. If there is an appeal (or if there are multiple

appeals) of the Court's Order and Final Judgment, the Defendant may move for a stay of the Effective Date.

13. "Effective Period" refers to the period that begins on the Effective Date and ends on the date that the Court's jurisdiction over this Stipulation and Order terminates.

14. "FCO" refers to Functional Capacity Outcome, the indication of a Class Member's ability to participate in HRA work activity programs which is the outcome of the WeCARE BPS and/or CRT assessment.

15. "Federal Disability Benefits" means the Supplemental Security Income ("SSI") and Social Security Disability ("SSD") programs administered by the Social Security Administration under Title II and Title XVI of the Social Security Act, 42 U.S.C. § 401, et seq. and 42 U.S.C. § 1381, et seq.

16. "Home Visit Needed/Homebound" or "HVN/HB" is a Reasonable Accommodation that excuses a Class Member from attending HRA or Vendor appointments outside of the home by reason of a physical, mental, or medical impairment.

17. "HRA" or "the Agency" means the Human Resources Administration of the City of New York.

18. "Infoline" means a telephone call center operated by HRA or Vendor staff to address client inquiries and respond to information requests from clients.

19. "Interim Agreement" means the Stipulation so-ordered by the Court on September 19, 2014.

20. "Job Center" means any so-designated HRA office that administers Cash Assistance cases for Class Members.

21. "Medicaid" means the federal medical assistance program authorized by 42 U.S.C. §§ 1396 et seq., 42 U.S.C. § 1320b-7, and 8 U.S.C. §§ 1611 et seq. and implemented in New York State pursuant to N.Y. Soc. Serv. Law §§ 363 et seq.; or the New York State medical assistance program authorized by N.Y. Soc. Serv. Law §§ 363 et seq.

22.	"Negative Case Action" is a reduction or discontinuance of Cash Assistance, including a sanction or case closing.

23.	"New York State Modified Mini Screen" means the mental health screen that has been validated by the New York State Office of Temporary and Disability Assistance.

24.	"Notice of Decision" means a notice HRA uses to advise clients of various case actions that affect their benefits.

25.	"OCSE" means the HRA Office of Child Support Enforcement.

26.	"Reasonable Accommodation" or "RA" means a change or adjustment to the Agency's policies or procedures to avoid discrimination on the basis of disability and to afford qualified individuals with meaningful access to the benefits and services provided by the Agency.

27.	"Residual Functional Capacity" or "RFC" is a term used by the Social Security Administration and defined in regulations at 20 C.F.R. §§ 404.1545, 416.945.

28.	"Robo-call" refers to an automated telephone call to clients to communicate a pre-recorded, scripted message.

29.	"Successful Instance of Outreach" means outreach resulting in compliance.

30.	"Supplemental Nutrition Assistance Program" or "SNAP" (formerly known as "Food Stamps") means the program that provides benefits pursuant to 7 U.S.C. §§ 2011 et seq., 42 U.S.C. § 1320b-7, and 8 U.S.C. §§ 1611 et seq. and implemented in New York by N.Y. Soc. Serv. Law §§ 95 & 97.

31.	"SNAP Access Alternatives" means the methods of communicating with HRA regarding a SNAP Only Case other than through a face-to-face appointment at a SNAP Only Center, including telephone, mail, Internet, facsimile, or through the client's authorized representative.

32.	"SNAP Only Case" shall mean a case in which the individual is or was a recipient of SNAP but is not currently receiving Cash Assistance benefits. A

SNAP Only Case may or may not include an individual who is a recipient of Medicaid benefits.

33. "SNAP Only Center" is an HRA office that administers SNAP Only Cases.

34. "SSI" means "Supplemental Security Income," a Federal Disability Benefit program administered by the Social Security Administration.

35. "Travel Companion" refers to a person whose availability HRA must take into account when scheduling appointments for a client so that the person can accompany the client to HRA appointments.

36. "Vendor" means an entity that, through contractual, licensing, or other arrangements, provides services or activities on behalf of HRA to HRA clients.

37. "VRS" refers to the WeCARE Vocational Rehabilitation Services track.

38. "WeCARE" refers to the program through which HRA and its vendors, including any subcontractors, assess the extent and impact of applicant and recipient disabilities and provide them with assistance related to employment, training, or other programs. This includes any successor program to WeCARE operated either by HRA itself or through a Vendor that serves essentially the same or similar functions.

39. "Wellness" refers to the WeCARE Wellness Track."

40. "WEP" means the "Work Experience Program" as defined in N.Y. Soc. Serv. Law § 336-c.

## DEFENDANT'S OBLIGATIONS

41. HRA agrees to implement the policies and practices contained in this Stipulation within six (6) months of the Effective Date unless otherwise specified herein or the parties agree to a longer implementation period. Defendant will continue to comply with the provisions of the Stipulation so-ordered by the Court on September 19, 2014 (the "Interim Agreement"), for six (6) months after the Effective Date, at which point the Parties will meet

and confer about whether the Interim Agreement or any provision thereof should be terminated or modified. Plaintiffs will not unreasonably refuse a request by Defendants to modify the terms of the Interim Agreement, to the extent that such modification is either (a) necessary to implement a provision of this Stipulation or (b) warranted based on a change in circumstances, including the introduction of other protections of Class Members from unwarranted interruptions of benefits.

42.    HRA will provide drafts of all policies and procedures created or modified as a result of this Stipulation, including those of WeCARE, to Plaintiffs' counsel for their review and comment. Plaintiffs' counsel will provide any comments within fourteen (14) days or as otherwise agreed to by the parties. If Plaintiffs' counsel believe that Defendant's failure to incorporate Plaintiffs' counsel's comments and recommendations is not minimal, but is sufficiently significant as to constitute a systemic failure to comply with the provisions of this Stipulation, Plaintiffs may seek relief from the Court consistent with paragraphs 141 through 143.

43.    HRA will conduct a review of its current procedures including those of WeCARE and Vendors that serve Class Members to ensure that Class Members are able to obtain benefits and maintain access to benefits and that its methods of administration do not discriminate on the basis of disability and will revise and reissue any procedures as necessary ("Disability Impact Review"). Going forward, HRA will conduct a Disability Impact Review of new policies affecting Class Members before they are published.

44.    HRA will not discriminate against Class Members on the basis of disability or handicap in any of its programs, including those programs operated by WeCARE.

45.    HRA and WeCARE will have effective systems in place to consistently accept and record requests for RAs and provide needed RAs to Class Members to enable them to access HRA benefits and services and to maintain access to HRA benefits and services.

46.   HRA and WeCARE will provide effective and adequate notice of RA rights, determinations, and procedures to Class Members.

47.   Class Members can ask for disability help and/or a reasonable accommodation ("RA") at any portal of the Agency and WeCARE.

48.   Any request made by a Class Member to obtain help to access benefits or maintain access to benefits that is related to disability will be deemed a request for an RA by HRA and WeCARE.

49.   If HRA contracts with outside Vendors to do tasks that HRA is obligated to do under this Stipulation, the relevant provisions of this Stipulation will apply to such Vendors.

<u>**REASONABLE ACCOMMODATION PROVISIONS**</u>

**Reasonable Accommodation Process**

50.   <u>**Identification of Persons Needing Disability Help/Disability Screening**</u>:

   a.   <u>Disability Inquiry Methods</u>. HRA will develop and HRA and WeCARE will implement "Disability Inquiry Methods," consisting of a range of tools to identify individuals who may need RAs for disabilities in order to comply with program requirements and maintain their access to benefits as described in paragraphs 51 through 52.

   b.   <u>Expert Consultant</u>.  Defendant will retain an expert consultant to assist in the development and implementation of the Disability Inquiry Methods described in paragraphs 51 through 52 (the "Expert Consultant"). The Expert Consultant may, upon agreement of the Parties, be asked to consult on the development and implementation of other policies pursuant to this Stipulation. Defendant will solicit recommendations from Plaintiffs' counsel and seek their agreement on the expert selected; Plaintiffs will not unreasonably withhold their agreement. Implementation in areas for which the Defendant retains the Expert Consultant will be completed within six (6) months of the recommendations of

the Expert Consultant, which shall be issued within 120 days of the Effective Date, unless an alternative date is agreed upon by the Parties in consultation with the Expert Consultant.

51.    **Disability Inquiry Methods**

    a.  <u>Disability Inquiry Scripts</u>. With the help of the Expert Consultant described in paragraph 50(b) above, HRA will develop and use Disability Inquiry Scripts, which shall be guided questions to aid HRA and Vendor staff in identifying client disabilities that may pose barriers to complying with program requirements and/or maintaining access to benefits as well as needed RAs. Disability Inquiry Scripts shall be used at application and recertification, and a broad range of interactions between clients and the Agency as recommended by the Expert Consultant and in consultation with Plaintiffs' counsel.

    b.  <u>Learning Disabilities and Cognitive Impairments Screening</u>. With the help of the Expert Consultant, HRA will develop tools to identify clients who have learning disabilities or cognitive impairments to the extent that such tools are brief and can be effectively administered by non-clinical HRA or Vendor staff. This Learning Disability and Cognitive Impairment Screening will be voluntary and will be offered at application (including re-applications), recertification, upon client request, and at any other client interactions and other events recommended by the Expert Consultant and agreed to by the parties.

    c.  <u>Mental Health Screening</u>.  HRA will implement voluntary mental health screening, such as the New York State Modified Mini Screen within six (6) months of the Effective Date of this Stipulation, unless an alternative date is agreed upon by the Parties in consultation with the Expert Consultant.  The Mental Health Screening will be made available to be taken voluntarily by clients at application (including re-applications), recertification, upon client request, and other events

recommended by the Expert Consultant and agreed to by the Parties.

52. HRA will review policies with respect to those Class Members who are referred to both Substance Use assessment and WeCARE to provide a process for identifying and implementing needed RAs.

53. <u>Actions based on Information from Disability Inquiry Methods</u>. With the help of the Expert Consultant, HRA will develop protocols for the Agency and WeCARE to act upon the information yielded from the Disability Inquiry Methods to offer RAs, make appropriate referrals, and to prevent inappropriate Negative Case Actions consistent with paragraphs 103 through 109. Clients referred to WeCARE from Job Centers will be screened for needed RAs as described in paragraphs 50 through 52 above and will be offered RAs to address identified needs to enable Class Members to attend WeCARE appointments. WeCARE will review the results of any Disability Inquiries referenced above that have been conducted. To the extent such Disability Inquiries have not been conducted, WeCARE will conduct these inquiries or an equivalent approved by the Expert Consultant. With the help of the Expert Consultant, WeCARE will develop Protocols to act upon the information yielded from the Disability Inquiry Methods. Plaintiffs will be provided with copies of any Disability Inquiry Methods and Protocols for their review and comment. Comments will be provided within fourteen (14) days unless otherwise agreed to by the Parties.

54. <u>Right not to disclose a disability or to accept an RA</u>. Clients cannot be required to disclose a disability or to accept an RA.  In instances where HRA, including WeCARE, suspects that a Class Member has a disability and s/he is unwilling to disclose the disability or cooperate with efforts to identify the suspected disability, the need to comply with program requirements and available RAs that may assist the Class Member in complying with program requirements will be discussed. If the Class Member does not disclose or cooperate, s/he may be required to comply with program requirements without RAs. HRA will also offer the Class Member a referral to WeCARE. The Expert Consultant will assist HRA and

- 13 -

WeCARE to develop a protocol for handling such cases to maximize compliance with HRA requirements consistent with existing regulations.

55. <u>Self-identified need for RAs</u>.  Clients may self-identify the need for an RA. Clients need not undergo screenings, including those as specified in paragraphs 50 and 51 before requesting an RA of HRA or WeCARE.

56. **Reasonable Accommodations Available to Clients**. HRA and WeCARE will accept for consideration all requests for RAs made by Class Members.

   a. <u>Menu of Reasonable Accommodations</u>.  HRA will maintain a Menu of Reasonable Accommodations ("RA Menu") which shall be a non-exclusive list of types of RAs that may be provided by the Agency and WeCARE. Even if a particular RA is not on the RA Menu, the request must still be considered. At a minimum, this RA Menu will include the following RAs:

      i. No appointments during rush hour;

      ii. Flexible Scheduling (because of a disability the Class Member cannot travel at or is not available for certain days and times and needs appointments scheduled consistent with those limitations);

      iii. Priority Queuing to minimize wait times;

      iv. Assistance with reading applications or forms;

      v. Assistance with completing applications or forms;

      vi. Scheduling of appointments based on Travel Companion availability;

      vii. Individualized assistance for the blind/visually impaired;

      viii. Sign Language Interpreter;

      ix. Individualized assistance for the hearing impaired;

      x. Case transfers or blocking case transfers to new centers;

      xi. Temporary travel exemption for pending para-transit (Access-A-Ride) approval; and

- 14 -

xii.   Home Visits Needed/Homebound ("HVN/HB") status.

b.   <u>Provision of RAs in Waiting Rooms and Non-Job Center locations</u>.  HRA and Vendor staff will be trained to identify and to the extent feasible offer RAs to those who need them at reception in Job Centers, BEV, OCSE Borough Offices, and WeCARE. HRA will develop and implement methods to monitor the provision of such RAs.

57.   **Recording Requests for Reasonable Accommodations**. The following types of RA requests will be recorded in a manner that allows for their implementation Agency-wide and at Vendor locations:

a.   <u>Menu RAs</u>. Requests for RAs that are listed on the RA Menu in paragraph 56(a) ("Menu RA") will be recorded; and, where a Class Member needs a Menu RA to attend an initial appointment at an HRA or Vendor site, the request will be recorded in such a manner that enables the Agency to provide the RA for the initial appointment.

b.   <u>Additional time to meet a deadline</u>. Requests from Class Members for additional time to meet a deadline will be recorded.

c.   <u>Other RAs Needed More than One Time</u>. Any other type of RA that is reasonably anticipated to be needed more than one time (on an ongoing basis) will be recorded.

d.   <u>Work-Related RAs</u>. Any request for an RA needed by a VRS client to participate in work activities, including RAs that are related to a specific job site, such as a piece of adaptive equipment, will be presumed to be needed more than one time and will be recorded.

58.   **Submission of Documents in Support of RA Requests**. Clients will be able to submit documents in support of their RA request by mail, fax, or email and will be given receipts for those submissions.

59.   **Provisional RA Implementation: RAs provided pending RA determination and appeal**. When a Class Member requests an RA from the

RA Menu, other than those related to center transfers, the RA will be provided provisionally during the period that the RA request is being processed and until the appeal period has ended. HRA and WeCARE will provide RAs not included on the RA menu during the period that the RA request is being processed and until the appeal period has ended, unless doing so is not operationally feasible.

60. **Job Center Transfer RAs**. When Class Members request RAs for Job Center transfers, their cases will be monitored so that no Negative Case Actions related to failures to appear at their Job Centers will be implemented.

61. **Notice Confirming Request for Reasonable Accommodation.** Clients who request ongoing RAs (those recorded pursuant to paragraph 57) will be given written notice confirming receipt of the RA request, listing the RA requested, and explaining that the RA will be implemented pending a final determination. The notice will include a telephone number to contact HRA or WeCARE for any inquiries related to the RA request. The notice will be provided in-person when Class Members make requests at Job Centers and, wherever possible, the information will also be conveyed orally. Clients who are provided an RA to attend an initial appointment at an HRA Vendor will be given a notice describing the RA.

62. **Medical Documentation and Provision of RAs**

    a. <u>RAs that will be granted without medical documentation</u>. HRA workers and Vendor staff will grant the following RAs on an ongoing basis without any medical documentation from Class Members:

        i. Sign Language Interpreter;

        ii. Individualized assistance for the hearing impaired;

        iii. Individualized assistance for the blind/visually impaired;

        iv. Assistance with reading applications or forms;

        v. Assistance with completing applications or forms;

   vi.  RAs, except for Home Visits Needed/Homebound ("HVN/HB") status and priority queuing, for Class Members permanently exempt from work requirements, such as those of at least 60 years of age;

  vii.  RAs needed to attend initial appointments at HRA programs and other vendor sites, including WeCARE, and/or otherwise comply with initial WeCARE requirements.

b.  <u>Where medical documentation is required</u>. For Class Members required to submit medical documentation in support of a request for an RA, HRA and WeCARE will:

   i.  accept documentation from all providers and weigh the documentation provided consistent with the Social Security Administration ("SSA") "Treating Physician Rule" as specified in paragraph 79 below;

  ii.  inform Class Members that assistance is available when needed to help secure medical documentation and provide such assistance when it is requested;

  iii.  give Class Members thirty (30) days to submit any required medical documentation and an additional fifteen (15) days upon request;

  iv.  in circumstances where a provider demands payment for Class Member records, either assist with obtaining the records or pay for the records;

   v.  for Class Members who have requested HVN/HB status, HRA will search its own records for documentation regarding home care services or home attendant services, supportive housing applications filed (HRA 2010e forms), and WeCARE records from the past 12 months. Where such records are located, they will be used to inform the decision on the HVN/HB request and will only be used to deny the HVN/HB request if no other documentation is available and Outreach pursuant to paragraph 62(b)(viii) has been conducted.

- 17 -

      vi.  For Class Members who have requested an RA and have been evaluated by WeCARE within the past 12 months, and who are being required to submit medical documentation, WeCARE records will be searched for the past 12 months for relevant documentation; and will be used to inform the decision on the RA request and will only be used to deny the RA request when no other documentation is available and Outreach pursuant to paragraph 62(b)(viii) has been conducted.

     vii.  Where the medical documentation in a Class Member's file indicates that the Class Member has a chronic or persistent medical condition that imposes permanent functional impairments, an RA request will not be denied on the basis that the information is out of date;

   viii.  Where a Class Member has been required to submit medical documentation in support of an RA request and no such documentation has been received, HRA will conduct outreach to inform the Class Member of the need to submit medical documentation and the availability of assistance to obtain documentation prior to sending a Final Notice of Determination denying the RA request for lack of medical documentation.

63.  **Reasonable Accommodation Determination Process**

     a.  <u>Client Phone Number Inquiry and Additional Contacts</u>. During the RA request process HRA will record client contact information along with (1) a secondary telephone number, if the Class Member chooses to provide it at which a Class Member wishes to be contacted; and (2) HRA will use the secondary telephone number when attempting to reach the Class Member by telephone. HRA will explain to Class Members that they have the option to use a mailing address that is different from their residential address.

- 18 -

b. Process for Review of RA and HVN/HB Requests.

   i. Questions about medical documentation/other questions. If an initial reviewer of an RA request finds issues with the submitted medical documentation that need to be resolved to complete the review, such as if the documentation is unclear, illegible, or if there are contradictions in the documentation, HRA will reach out to the Class Member and/or provider to attempt to resolve these issues in order to make a more fully informed determination.

   ii. Decision to Grant RA Requested. If the decision is to grant the requested RA, HRA will issue a "Final Notice of Determination" (as defined in accordance with paragraph 63(c), infra) granting the RA request.

   iii. Decisions to Deny RA Requests or offer Alternatives. Initial decisions based on medical documentation to deny requested RAs or to offer alternatives will be reviewed by a supervisor. The review will include confirmation that any outreach required by this paragraph has been conducted.

      (a) If the supervisor disagrees with an initial decision to deny the requested RA or offer an alternative, HRA will issue a Final Notice of Determination granting the original RA request.

      (b) If a supervisor agrees with the decision to deny the requested RA or offer an alternative, a supervisor who is empowered to change the RA decision will contact the Class Member by telephone to discuss the RA request and, if appropriate, alternative RAs or offer more time to provide additional supporting documentation. HRA will then issue the appropriate notice based on the information obtained by telephone. If that information confirms the initial decision, HRA will issue a Final Notice of Determination denying the RA request or granting an

- 19 -

alternative RA. If that information leads to a reversal of the initial decision, HRA will issue a Final Notice of Determination granting the RA request.

(c) When supervisors approve initial decisions to deny requested RAs or to offer alternatives and Class Members cannot be reached by telephone within five (5) business days or the Class Member has not reached out to the Agency or WeCARE, HRA will issue a Final Notice of Determination in accordance with the initial decision.

c. <u>Reasonable Accommodation Final Notices of Determination and Appeal Rights</u>. HRA will issue RA Final Notices of Determination with the determination on the RA request. The notice will include (i) the determination as to whether the RA was granted, denied, or an alternative was offered along with a clear statement explaining why an RA was denied or an alternative was offered; (ii) a list of any documents reviewed; (iii) if the RA has been granted, instructions for Class Members on how the RA will be implemented (e.g., if the RA is Priority Queuing what to do when arriving at a Job Center; if assistance in reading or completing forms is needed, how to get that help); (iv) what Class Members should do if a granted RA is not being implemented; (v) instructions on how to appeal HRA's determination; and (vi) a telephone number for Class Members to call to discuss (i)-(vi) above. To the extent possible, the RA will also be communicated orally.

d. <u>Appeals</u>. Clients will have 30 days to appeal an RA determination of HRA or WeCARE. The RA will remain in effect during the 30-day period and pending the outcome of any appeal.

64. <u>Termination of RAs</u>. If HRA or WeCARE intend to stop providing an RA, HRA will issue a notice to the Class Member of this intention. This notice will include instructions on how to appeal HRA's determination to

discontinue the RA. The Class Member will have 30 days to appeal HRA's determination. The RA will continue to be provided during this period and pending the outcome of any appeal. The notice to the Class Member will include a statement to this effect. HRA may only initiate the termination of an RA if there is documented, new information that the Class Member no longer needs an RA. However, where an RA is granted for a fixed period of time the Class Member will receive notice in advance of its expiration and have the opportunity to submit documentation supporting the continuation of the RA. Where documentation is received the procedures in paragraph 63 will be followed; where no documentation is received the RA will expire if the outreach procedures in paragraph 62(b)(viii) have been followed.

65. <u>System Deadlines</u>. HRA and WeCARE will develop a mechanism to override certain system deadlines consistent with all legal requirements.

66. <u>Client Telephone Access Related to RAs, RA Requests, and RA Complaints</u>. At any time, a Class Member may inquire about the RA process; the status of a pending RA request, including whether all documentation has been submitted; report any changes in their own telephone numbers; discuss their RA needs; or make complaints about the RA process (e.g., that an RA has not been accepted, processed, or implemented) by calling his or her case worker, a supervisor, or a central number, which will be answered live during business hours. The Class Member contact will be recorded promptly (within 24 hours), and the Class Member will be provided an answer within a reasonable time defined as enough time to meet a deadline, or avert and/or abate an emergency. When appropriate, Class Members will be advised of fair hearing rights when they call to make such inquiries and complaints.

67. <u>Client Services Screen</u>. A Client Services Screen shall be accessible to client contact staff including staff at Job Centers, BEV, OCSE, and WeCARE which will include at a minimum the following information: pending and granted RAs, including HVN/HB status; the result of the most recent disability screen; current WeCARE status/track; Employability status;, and SSI status, if any.

# WeCARE Provisions

## WeCARE Reasonable Accommodation Determinations

68. RAs requested or identified at WeCARE will be provisionally granted and treated as ongoing RAs until a determination is made and notice will be provided to the Class Member pursuant to paragraph 61. RAs granted by WeCARE will be clearly communicated to the Class Member in writing, and to the extent possible, orally; and will be recorded in such a manner that they can be implemented agency-wide.

69. If a Class Member requests an RA at WeCARE and it is denied, the Class Member will be provided the opportunity to speak to a WeCARE supervisor who is empowered to change the RA decision. HRA will provide Final Notices of Determination to Class Members granted RAs at WeCARE. Final Notices of Determination for Class Members denied RAs at WeCARE or offered alternative RAs at WeCARE will explain appeal rights, including the right to keep an RA in place until the appeal period has terminated.

70. Final Notices of Determination for RA denials and offers of alternative RAs will include a clear statement explaining why an RA was denied or an alternative was offered. The determination will include a list of any documents reviewed.

71. WeCARE decision-makers who make RA determinations and who disagree with an RA identified by other individuals in the BPS assessment process will be required to articulate their reasoning in writing and this will be included in the BPS report offered to the Class Member pursuant to paragraph 82 infra.

72. The need for new RAs will be assessed and the need for RAs granted at WeCARE will be reassessed at Biopsychosocial ("BPS") or Clinical Review Team ("CRT") appointments and upon completion of Wellness Plans. Class Members undergoing reassessment will be given notice of the reassessment, including explanations of what documentation may be required and that they may receive assistance in obtaining this documentation. RAs may only be

terminated as a result of this reassessment if there is documented, new information that there is no longer a need for the RA.

73.    WeCARE Vendors will assist WeCARE clients in applying for Access-a-Ride and will provide an exemption from in-office appointments while they apply for the service.

74.    For Staten Island residents who cannot, for documented clinical reasons, take public transportation to their WeCARE appointments, HRA will provide transportation to the extent feasible. Staten Island Class Members determined to be unable to use the provided transportation for documented clinical reasons, will be exempted from attending WeCARE in person.

75.    **Submission of Documents**.  WeCARE clients will be able to submit documents by mail, fax, or email and will be given receipts for their submissions.

76.    HRA will develop a mechanism at WeCARE Vendor sites to grant HVN/HB status or refer such cases for appropriate review.

## WeCARE Evaluation/Biopsychosocial Assessments

77.    When requested by Class Members or when Class Members are unable to obtain medical documentation, WeCARE will attempt to obtain releases from Class Members and assist them in obtaining medical documentation when needed by WeCARE in connection with WeCARE BPS or CRT evaluations, Wellness, Federal Disability Benefits applications, and RA (including HVN/HB) requests. WeCARE Vendors will inquire whether the Class Member needs assistance to obtain medical documentation when no such documentation is presented, assist in obtaining medical documentation when requested, and offer to do so when it appears Class Members may need assistance. Clients will not be infracted for being unable to provide medical documentation.

78.    WeCARE physicians and other clinicians will review all medical documentation, including documentation from Class Members' treating providers, and make medical documentation provided by the Class Member

part of the Class Member's WeCARE record. The Class Member will be provided with a list of the medical documentation the clinicians considered in determining the Functional Capacity Outcome ("FCO").

79.  WeCARE physicians and other clinicians will consider medical documentation provided by the Class Member as a factor in determining the Class Member's functional capacity, attributing weight to such documentation consistent with the SSA "treating physician rule," 20 C.F.R. § 404.1527, including the following factors set forth therein:

   a.  Examining vs. non-examining physician, type of specialty, and treatment relationship;

   b.  Length of treatment;

   c.  Type or frequency of treatment;

   d.  Detail and comprehensiveness of the documentation;

   e.  Consistency with other records;

   f.  Specialization; and

   g.  Other factors, including the treating source's understanding of Social Security disability programs and their evidentiary requirements.

80.  As part of the BPS process, WeCARE will utilize the SSA's sequential evaluation process to determine whether Class Members are potentially eligible for Federal Disability Benefits. As per SSA's procedures; the sequential evaluation process will be conducted in a set order and Class Members who meet one of SSA's listings, equal an SSA listing, cannot perform any past relevant work based on Residual Functional Capacity ("RFC"), or cannot perform any type of work based on the medical-vocational guidelines, or "grid rules," will be referred to the SSI track.

81.  As part of the CRT process, the sequential process will also be utilized. If a Class Member is found to meet or equal an SSA listing for disability, the reviewing CRT clinician will refer the Class Member to the SSI track. If the Class Member does not meet or equal a listing, then the CRT clinician will

need to determine the RFC. If the RFC can be determined based on the Class Member's WeCARE history, CRT review, and any documents a Class Member may bring in at the time of CRT, then the CRT clinician will continue to determine if a Class Member can perform any past relevant work or any type work. If the RFC cannot be determined, then the Class Member will be referred for a new BPS evaluation.

82.    Class Members will be offered copies of their BPS reports.

### Enhanced WeCARE Outreach

83.    "Enhanced Outreach" will be conducted using specialized scripts for all missed WeCARE appointments. The purpose of Enhanced Outreach is to assist Class Members in overcoming barriers to participating in WeCARE, including identifying whether a clinical condition or need for an RA affected the Class Member's ability to attend the appointment, and to address any needs for RAs.

84.    Components of Enhanced Outreach.

    a.    Enhanced Outreach will include the use of telephone calls; letters (where time permits); email where available; and, in limited circumstances, home visits to contact Class Members following missed appointments based on Client Contact Information; and additional Enhanced Outreach if the rescheduled appointment is also missed.

    b.    For the Vocational Rehabilitation Services ("VRS") track, WeCARE will conduct five (5) Successful Instances of Outreach per cycle of engagement before an infraction is posted without outreach.

    c.    Class Members in VRS who have reached their limit of five (5) Successful Instances of Outreach as referenced in paragraph b above will be assessed to determine if they need additional Case Management Services and, if appropriate, a referral to CRT before any infraction is posted.

    d.  Class Members in the Wellness track will not be subject to any limit on Successful Instances of Outreach.

    e.  WeCARE Vendors will use of the "test of reason" to excuse absences when the absence appears to be related to known clinical conditions.

    f.  WeCARE Vendors will record all outreach conducted in a form that can be tracked electronically.

## WeCARE Wellness Track

85.    Wellness track clients will have the option to conduct follow-up appointments by telephone.

## WeCARE Vocational Rehabilitation Services Track

86.    For those Class Members 50 years of age or older, the DVE assessment will include an assessment of Class Members' RFC to determine the likelihood of being found disabled under the SSA rules. If a Class Member is determined to be likely disabled pursuant to the SSA rules, he or she will be referred to the SSI track.

87.    RAs found to be needed as a result of the DVE process will be provided to Class Members in all VRS activities and implemented and recorded as ongoing RAs as described in paragraph 57.

88.    VRS participants will be assigned required hours not to exceed 35 per week. If reduced hours are appropriate consistent with the Class Member's functional capacity as determined in the DVE and needed RAs, the number of assigned hours will be reduced to 30, 25, or 20 hours as appropriate.

89.    VRS track clients will have the option to participate in a range of activities consistent with the activities available to fully employable clients pursuant to HRA's Employment Plan consistent with Class Member preference and the results of the DVE. WeCARE Vendors will count job search activity hours as a work activity unless exempt. WeCARE will phase out WEP and replace it with other opportunities for Class Members on the VRS track.

## Assisting Clients with SSI Applications

90. HRA will develop and implement standard protocols for WeCARE with respect to handling Class Members in the WeCARE SSI track (i) who have an appointed representative and (ii) those who do not have an appointed representative, with the goal of facilitating successful Federal Disability Benefits applications and appeals as applicable. Case Management Services for Class Members on the SSI track will include coordination with representatives for those Class Members with outside representation for their Federal Disability Benefits applications and appeals. WeCARE will inquire whether Class Members in the SSI track have a representative. Neither HRA nor its Vendors will contact SSA with respect to a pending Federal Disability Benefit claim or appeal if a Class Member is known to be represented without the consent of such representative, other than to ascertain if an appeal has been filed.

91. **Referral of Appeals**. HRA will develop a contract with a Vendor to which Class Members who have been denied Federal Disability Benefits on appeal can be referred for assistance with the SSA Appeals Council review process.

92. HRA will develop a contract with Vendors to evaluate and assist appropriate HVN/HB clients to apply for Federal Disability Benefits.

93. HRA will also consider and investigate developing a contract with a provider other than the WeCARE Vendors to assist SSI track clients and/or HVN/HB clients who need assistance with SSA Appeals Council Reviews and federal court appeals.

94. Clients who are placed on the WeCARE SSI track but who are not eligible for Federal Disability Benefits due to immigration status will remain exempt but will not be called in to apply for Federal Disability Benefits.

## WeCARE Re-Engagement

95. Consistent with Agency-wide efforts to minimize unnecessary appointments, HRA will develop a procedure by which unengaged Class Members who have been referred to WeCARE within the past 12 months can elect to

accept a direct referral to WeCARE, rather than being called in to the Job Center.

96. For unengaged Class Members with a prior WeCARE history, HRA will review current HRA and WeCARE policies regarding track placement with the goals of minimizing the need for unnecessary appointments and increasing the accuracy of track placement and incorporate the principles specified below in a procedure:

   a. When, during re-engagement at WeCARE, a Class Member (a) claims his previous track assignment was not appropriate; (b) has a case that has been remanded for re-assessment following a Fair Hearing request; or (c) reports a change in medical and/or mental health status to HRA or WeCARE, the Class Member will receive a new BPS or CRT.

   b. WeCARE clients will be told about the outcome of the BPS or CRT and given the opportunity to disagree with the FCO/track placement. If Class Members provide copies of any documents not reviewed at a BPS or CRT, those documents will be reviewed. WeCARE may change the FCO/track assignment if appropriate.

   c. Track Placement Presumption. Where Class Members were referred to WeCARE within a year of a previous WeCARE activity, they will not be placed in a track with greater engagement requirements than the track from their previous assignment unless a WeCARE clinician explains the placement in writing, including a clinical justification that the Class Member's functional capacity has improved in ways that would make the track requiring greater engagement appropriate.

97. **Voluntary participation after infraction**. WeCARE clients in VRS who are alleged to have infracted with WeCARE program requirements and are entitled to Conciliation may continue to voluntarily attend the program. If Conciliation is not successful or results in an appointment for a re-evaluation

- 28 -

of a Class Member's FCO, the VRS participation would end with the scheduling of a BPS or CRT appointment.

**WeCARE Case Management Provisions**

98. HRA will assess the case management needs of Class Members at BPS, CRT, and at such other intervals as appropriate.

99. Case Management Services will be provided to all WeCARE clients. Case Management Services will be tailored to the Class Members' individual needs as determined through assessments and interviews with Class Members. Case Management Services, including those listed in paragraph 101, will be set forth in a procedure.

100. <u>Individual Case Managers</u>. To the maximum extent feasible, Class Members will be assigned to an individual case manager. If teams of case managers are used to provide services for a cohort of Class Members, Class Members will be provided the names, contact numbers, and email addresses of the team members.

101. <u>Focus</u>. The focus of Case Management Services will be to assist Class Members to understand WeCARE program requirements, keep eligible cases active for Cash Assistance, and secure Federal Disability Benefits for those Class Members who are eligible. Case Management Services will include the services and interactions listed in Paragraphs (a) through (l) below as needed or appropriate for the individual Class Member.

     a. Enhanced Outreach as described in Paragraphs 83 and 84 for missed WeCARE appointments, though Enhanced Outreach may be conducted by specialized WeCARE outreach workers rather than a Class Member's case manager.

     b. Explain to Class Members Functional Capacity Outcomes/WeCARE Tracks assigned to Class Members (VRS, Wellness, Wellness Plus, SSI, or Fully Employable Without Limitations) and explain program requirements per FCO/WeCARE track.

- 29 -

c. Provide Class Members with Notification of Work Requirement ("NOWR") and explain Fair Hearing rights if Class Members disagree with determinations.

d. Clarify WeCARE program requirements for Class Members when necessary and assist Class Members with problem-solving regarding WeCARE program requirements.

e. Assist in the process to identify and secure RAs, including HVN/HB status, needed to comply with HRA and/or WeCARE requirements.

f. At any time in the WeCARE process Class Members may submit new medical documentation. Case Managers will review new medical documentation and, if indicated, refer Class Members to CRT when they have new or worsened clinical conditions and will consider the need for additional RAs and assist with securing needed RAs.

g. Assist in obtaining medical documentation when requested and offer to do so when it appears Class Members may need assistance.

h. Assist with completing forms, including HRA recertification mailer forms, when assistance is requested and offer to do so when it appears Class Members may need assistance based on observations or available information with respect to impairments, illiteracy, or other factors.

i. When meeting with Class Members will review NYCWAY records, remind Class Members of upcoming or missed HRA and WeCARE appointments, and address any anticipated needs or possible obstacles to compliance.

j. Provide referrals to community-based organizations for services as needed and appropriate.

k. Allow Class Members to communicate with WeCARE in-person, by email, and by phone. Case Managers will reply within a reasonable period of time not to exceed two (2)

business days if a message is left unless a shorter time frame is required to meet a deadline or avert and/or abate an emergency.

l.  Determine whether Class Members need or receive other services, such as home care services, and either direct them to those services or work with their contacts there to connect Class Members with needed services.

102.  Those individuals identified as needing a higher level of Case Management Services due to anticipated difficulty in maintaining benefits or accessing HRA and Vendor services will receive enhanced Case Management Services designed to assist them in complying with HRA requirements to ensure case continuity, including proactively reviewing upcoming WeCARE and HRA appointments and other responsibilities and assessing and addressing any anticipated needs or possible obstacles to compliance.

### PROTECTIONS AGAINST UNNECESSARY NEGATIVE CASE ACTIONS

103.  Going forward, HRA and WeCARE will not implement any new procedures for utilizing the practice of Autoposting Negative Case Actions.

104.  <u>Reduction of Unnecessary Appointments</u>. HRA and WeCARE will continue to minimize mandatory appointments for Class Members.

105.  **Appointment Reminders, Outreach, and Resolution Procedures**.  The steps described below are in addition to the outreach described in the WeCARE and Case Management Sections in paragraphs 83 through 84 and 98 through 102 above and will be included in an HRA procedure:

a.  <u>Pre-appointment reminders</u>. HRA will conduct Robo-calls to provide reminders of application and recertification appointments and recertification mailer obligations to Class Members with phone numbers, as well as agreed-upon RA information. A special Robo-call script will be developed for the 6-month recertification mailer reminder calls.

b. Post-appointment reminders.

  i. Phone. Following missed recertification and application appointments, HRA will conduct Robo-calls to advise Class Members to reschedule their appointments within five (5) days from the scheduled appointment. HRA will prevent the Notice of Decision Process from initiating until after the 5-day period expires. The Robo-calls will include agreed-upon RA information.

  ii. Letter. Following missed application or recertification interview appointments, HRA will send Class Members letters to inform them of the missed appointments and instructions for rescheduling the appointments. The letter will include the Disability Insert.

## 106. Conference/Conciliation Procedures.

a. The Conciliation notice will advise Class Members that they may request an RA needed to participate in Conciliation and include a phone number to make such requests. HRA will confer with Plaintiffs on the revised Conciliation notice. Information provided by a Class Member when requesting an RA, including RAs needed to participate in Conciliation or Conferences, may be used as a basis for a good cause determination.

b. HRA's Conciliation and Conference appointments will address disabilities and the need for RAs to comply with HRA requirements.

c. HRA will revise its Conciliation and Conference process to use a set of structured questions to guide discussion and to reveal a need for an RA.

d. When a participant raises a physical or mental impairment as a reason for the alleged infraction, HRA will grant the participant good cause and refer the participant to WeCARE.

    e. <u>Pre-Conciliation Outreach</u>. HRA will provide Class Members with Pre-conciliation Outreach for non-WeCARE appointments for which Conciliation is available such as Job Center engagement appointments. Pre-conciliation Outreach will be conducted prior to issuance of a Conciliation Notice to Class Members who fail to comply with employment requirements and will include attempts to contact the Class Members by telephone and letter to attempt to resolve the infraction and address any barriers to compliance. If Pre-Conciliation Outreach is successful, the Class Member will not experience a related Negative Case Action.

    f. Class members will be able to participate in Conference appointments by telephone, and a telephone number to request a telephone Conference will be listed in the appropriate notices.

107. **"Pre-Notice of Decision Case Review" for Class Members.** Before issuing a Notice of Decision pertaining to a Negative Case Action for Class Members HRA will:

    a. conduct file reviews of Class Members' cases to determine, to the extent evident from the case record, whether there were factual errors, including a failure to provide a pending or granted RA prior to the issuance of Notices of Decision regarding Negative Case Actions. If the review shows a factual error or that a failure to provide a pending, granted, or needed RA may have led to the Negative Case Action, no Notice of Decision will issue.

    b. If the review does not avert the negative action, HRA will conduct outreach to determine whether the Negative Case Action can be averted or resolved.

108. **<u>Pre-Fair Hearing File Review</u>**.  Prior to Fair Hearings, HRA will review cases to determine, to the extent evident from the case record, whether the failure to provide a pending or granted RA may have led to the Negative Case Action at issue. If the review shows that a failure to provide a pending, granted, or needed RA may have led to the Negative Case Action, HRA will

withdraw the Negative Case Action even if the Class Member does not appear at the fair hearing.

109. **Treatment for Certain Vulnerable Cohorts**

    a. <u>HVN/HB</u>

        i. When a Class Member requests HVN/HB status

            (a) For Cash Assistance clients, HRA will record the request and schedule a home appointment with the client. While HRA is evaluating the request, the Class Member will be treated as HVN/HB.

            (b) HRA will make a determination on the request for HVN/HB designation based on medical documentation. HRA will provide a written explanation to the Class Member explaining the HVN/HB determination process and how to provide medical documentation. At the initial home visit, the HRA worker will ask the Class Member for any medical documentation supporting their request for HVN/HB status. The worker will also ask whether the Class Member wants HRA's assistance in gathering medical documentation from his or her health care provider. Clients who request HRA's assistance will be asked to sign medical releases so that HRA can request medical documentation.

            (c) HRA will issue a notice to the Class Member with the outcome of HRA's determination on the request to be treated as HVN/HB. This notice will include instructions on how to appeal HRA's determination. The Class Member will have 30 days to appeal HRA's determination. Cash Assistance clients will be treated as HVN/HB during this 30-day period and pending the outcome of any appeal. The notice to the Class Member will include a statement to

this effect.

(d) If a class member refuses a home appointment, HRA will provide written notice to the individual that a home appointment was offered and refused. HRA will include in this notice instructions on how to comply with program requirements by mail, phone, or facsimile or any other means HRA designates when a face-to-face interview is not required by law.

(e) If HRA intends to stop treating the Class Member as HVN/HB, HRA will issue a notice to the Class Member of this intention. This notice will include instructions on how to appeal HRA's determination to stop treating the Class Member as HVN/HB. The Class Member will have 30 days to appeal HRA's determination.  Clients will be treated as HVN/HB during this 30-day period and pending the outcome of any appeal. The notice to the Class Member will include a statement to this effect.

(f) Eligibility issues For SNAP-Only Cases will be handled by HRA via SNAP Access Alternatives. If SNAP Access Alternatives prove unsuccessful and the individual was previously coded HVN/HB, HRA will conduct a home visit to attempt to resolve the issue.

(g) <u>HVN/HB Denied or Expired</u>. For clients who are denied HVN/HB status or whose HVN/HB status has expired, HRA supervisors will review their cases before HRA schedules the first Job Center appointments following the HVN/HB denial or expiration. HRA will review those cases again for clients who fail to report to their Job Center appointments. HRA may refer clients whose requests for HVN/HB status have been denied or whose HVN/HB status has expired directly to WeCARE.

    (h) HRA will assess the case management needs of HVN/HB clients at the initial visit and at such other intervals as appropriate. Case Management Services will be tailored to the client's individual needs. Those individuals identified as needing a higher level of Case Management Services due to anticipated difficulty in maintaining benefits or accessing HRA services will receive enhanced Case Management Services designed to assist them in complying with HRA requirements to ensure case continuity. Case Management Services will be set forth in a procedure.

    (i) Nothing in this section precludes HRA from integrating the HVN/HB determination process with the RA determination process described above in a manner that is consistent with these paragraphs.

b.  Homeless Clients.

    i. HRA will coordinate with Community Based Organizations (CBOs) that participate in the Department of Homeless Services' street homelessness outreach project to provide HVN/HB status to clients of these programs. HRA will serve these clients at the CBO offices or other locations agreed upon by HRA, the client and the CBO. HRA will accept documentation from the CBOs indicating client eligibility for HVN/HB status and exemption from participation in work activities consistent with 18 NYCRR §385.2(d). HRA will conduct Escalating Outreach before rejecting an application or issuing a Negative Case Action against Street Homeless Outreach Program clients

c. Hospitalized Class Members. HRA will establish a procedure with respect to Class Members about whom a temporary hospitalization is reported to the Agency or WeCARE with the

goal of avoiding Negative Case Actions that may be related to a clinical condition or need for RAs.

### COMMUNICATIONS PROVISIONS

110. HRA will take steps such that communications of the Agency and WeCARE with Class Members are effective and available in multiple formats to afford meaningful access to Agency and Vendor services, programs, and activities in accordance with Title II of the Americans with Disabilities Act and applicable regulations issued by the Department of Justice pursuant to that title.

111. In determining the format of communication to Class Members, HRA and WeCARE will give primary consideration to the format requested by the Class Member.

112. HRA will enhance and/or implement systems to enable Class Members to communicate effectively with the Agency and WeCARE via telephone, email, fax, and mail. HRA will consider using text messaging to the extent feasible and agreed to by clients. HRA will take the steps necessary to make its Website accessible to Class Members.

113. HRA will provide receipts or confirmation numbers to verify Class Member contact with the Agency and WeCARE including submission of documents and transactions related to case actions such as requests to reschedule appointments, for good cause, for Conferences, and requests related to emergencies.

114. HRA will enhance and/or implement systems to enable effective, real-time communication for deaf and hearing impaired Class Members with the Agency and WeCARE as follows:

    a. For in-person appointments, sign language interpreters for the deaf and hearing impaired will be provided;

    b. HRA will pilot a program to implement the use of video remote interpreting by which Job Centers and SNAP Centers will use video conferencing equipment to provide real-time sign

language interpreting services as provided in 28 C.F.R. §
35.160(d). Video remote interpreting may be used in place of in-
person interpreters when agreed to by clients; and

c. HRA will train Agency and Vendor staff with client contact on
the methods used by the deaf and hearing impaired to
communicate by telephone, including the telecommunications
relay service and the video relay service.

115. HRA and WeCARE will respond on a case by case basis to requests for RAs
from Class Members who are blind or visually impaired.

116. HRA will develop and implement effective procedures to enable Class
Members to reschedule appointments with the Agency and WeCARE.

117. The HRA Infoline or another similar mechanism which permits effective
telephone access to Class Members will have capacity added to enable Class
Members to learn current case status, upcoming appointments,
documentation requirements, pending Negative Case Actions, and RA
request status.

118. HRA will develop a mechanism through which Class Members can reach
staff during business hours to address case emergencies when those Class
Members are unable to obtain timely assistance at their Job Centers or
WeCARE.

119. HRA will maintain a telephone number by which Class Members can
communicate complaints regarding requests for and implementation of RAs.

120. In conjunction with Plaintiffs' counsel, HRA will devise standards and
develop effective procedures for regularly auditing:

a. the "Rescheduling" Phone Numbers listed on HRA and Vendor
notices to confirm that Class Members can get through on these
numbers to reschedule appointments;

b. Class Members' access to Infoline or another similar mechanism
for information;

- 38 -

    c.  the mechanism in paragraph 118 by which Class Members can reach HRA workers and WeCARE;

    d.  provision of receipts or confirmation numbers as provided in paragraph 113; and

    e.  other communications between Class Members and HRA or Vendor staff.

121. HRA will report the results of the audits discussed in paragraph 120 to Plaintiffs' counsel quarterly and will meet with Plaintiffs' counsel after the issuance of each quarterly Communications Report to discuss performance.

122. Within 90 days of the Effective Date, unless the Parties agree upon a later deadline, as part of developing the Monitoring Protocol described in paragraphs 130 through 137, the Parties will negotiate in good faith to reach consensus on the standards, auditing methodologies, and reporting referenced in paragraph 120 above and will incorporate these into the Monitoring Protocol which will be filed with the Court and incorporated into the terms of this Stipulation by reference as provided in paragraph 130 below.

## NOTICE PROVISIONS

123. **Readability of Written Materials**: Subject to state approval when applicable, HRA will revise its written materials as set forth below to improve readability.

    a.  Guidelines for Written Materials. Consistent with the recommendations of an Expert, HRA will consider the following Guidelines in revising those HRA-developed notices specified in paragraph 123(b):

        i.  Written materials will have the lowest possible reading level, measured by the appropriate readability measure, that is consistent with content that must be included in the material to comply with any legal requirements;

- 39 -

    ii.  Use active sentences as much as possible and avoid use of the passive voice;

    iii.  Use short sentences and simple words as much as possible. When possible, select words likely to be familiar and easily recognizable;

    iv.  Use the first or second person whenever appropriate;

    v.  Avoid long paragraphs wherever possible; and

    vi.  Effectively use headings; bullets; typeface; and where possible, graphic layout, including pictures, symbols, and icons.

  b.  <u>Priority for Readability Review and Revision</u>. HRA will prioritize the review and revision of the following HRA-developed documents:

    i.  Notices of appointment;

    ii.  Notices that require a response from the Class Member;

    iii.  Notices that concern the denial, termination, reduction, increase, or issuance of a benefit or service;

    iv.  Notices that convey disability-related information to Class Members, such as concerning WeCARE and the RA process; and

    v.  Written materials that are most frequently provided to Class Members.

124. **Timing for Implementing Readability Revisions.** Consistent with the categories set forth in paragraph 123(b), the parties will develop a reasonable list of HRA-developed documents to be revised. HRA will confer with Plaintiffs to identify a reasonable number of documents from this list that will be revised within eighteen (18) months from the Effective Date. HRA will commence revising the identified documents as soon as practicable and provide Plaintiffs' counsel with the revised documents referenced in paragraph 123(b) for review and comment on a rolling basis. Plaintiff's counsel will provide any comments within fourteen (14) days. At

the end of eighteen (18) months the Parties will meet and confer to develop a
schedule for revising the remaining documents on the list.

125. **Inclusion of Disability Rights Information in Written Materials.** With
the help of an Expert, HRA will develop a Disability Insert to be included
when issuing certain notices to Class Members. For notices that meet the
criteria in paragraph 123(b), HRA will either include a Disability Insert or
develop and include Notice of Disability Rights language. Such language
may be developed with the assistance of an Expert and will notify Class
Members of their rights under the ADA and how to request an RA. Notices
that are accompanied by the Disability Insert will include a reference to the
Disability Insert. Plaintiffs will have the opportunity to review and comment
on the Disability Insert and Disability Rights language. Plaintiffs' counsel
will provide any comments within fourteen (14) days.

## TRAINING AND STAFF DEVELOPMENT

126. **Disability Advisory Community Panel**

    a.  HRA will form a Disability Advisory Community Panel
("Panel"), which is intended as a collaborative entity through
which HRA can gather expertise, input, and feedback from
disability community organizations and members of the
disability community regarding policies, practices, and
initiatives of the Agency.

    b.  The Panel will meet quarterly and include representatives from
organizations that have an interest in, advocate for, and/or
provide services to people with disabilities, as well as people
with disabilities including HRA clients.

    c.  The Legal Aid Society will have an opportunity to propose two
members of the panel, one of whom may be a non-attorney
employee or contractor of The Legal Aid Society. Defendants
will not unreasonably reject Plaintiffs' proposed panel members.

    d.  The Panel will address emerging issues, challenges, and
solutions related to disability and other access and functional

needs as they relate to HRA policy and the delivery of services to clients with disabilities.

127. **Staff Training**

    a.  HRA agrees to develop new ADA training curricula ("ADA Training") for various levels of staff across the Agency as well as a Disability Evaluation training curricula for Agency and Vendor staff charged with evaluating disability and RA requests. Defendant will provide Plaintiffs' counsel with draft training materials for their review and comment. Plaintiffs' counsel will provide any comments within fourteen (14) calendar days. If Plaintiffs' counsel believe that Defendant's failure to incorporate Plaintiffs' counsel's comments and recommendations constitutes a systemic failure to comply with the provisions of the Settlement, Plaintiffs may seek relief from the Court consistent with paragraphs 141 through 143. Defendant will seek input in developing training curricula from the Disability Advisory Community Panel, the Mayor's Office for People with Disabilities, the Executive Director for ADA Policy, and others with expertise in effectively working with and meeting the needs of people with disabilities.

    b.  The ADA Training will focus on specific Agency policies and procedures, as well as areas of cultural competence, disability awareness, and effective communication with people with disabilities.

    c.  Using the new ADA Training curricula HRA will conduct cross training throughout various units at HRA, most notably at the key points of entry and the programs most likely to serve people with disabilities.

    d.  Defendant will develop quality assurance mechanisms and reinforcement trainings to ensure that all HRA and Vendor staff has the skill set to serve disabled clients and that all appropriate HRA and Vendor staff has the skill set to evaluate disability and RA requests.

    e.  Defendant will also develop other methods of building the capacity of staff to effectively address the needs of people with disabilities through effective supervision and coaching. Defendants will develop supervisory trainings that will include coaching methods to assist front-line staff with difficult cases. A workgroup will be convened to explore the most effective training tools for ongoing support at all levels of the Agency.

128.  **Disability Awareness**. HRA will use a variety of media to continue to publically affirm its commitment to serving clients with disabilities and to providing those clients with meaningful access to HRA's benefits and services. HRA's Executive Director of Disability Affairs, with input from the Disability Advisory Committee, will develop mechanisms to effectively explain disability-related barriers clients may experience in attempting to access HRA programs and services and the various types of RAs available to overcome these barriers.

129.  **Executive Director of Disability Affairs**. HRA has developed a new position of Executive Director of Disability Affairs. The Executive Director will collaborate with HRA program areas to assess policies and procedures and coordinate with program areas to improve service delivery for persons with disabilities so that they have meaningful access to HRA programs. The Executive Director will also investigate complaints alleging noncompliance with the ADA and implement solutions.

## MONITORING

130.  The parties will jointly develop a protocol for monitoring the Defendants' compliance with the terms of this Stipulation ("Monitoring Protocol") within three (3) months of the Effective Date, which shall be submitted to the Court and deemed incorporated into this Stipulation.

131.  The primary objective of the Monitoring Protocol will be to measure compliance with the goals of this Stipulation: to identify, process, and provide necessary RAs so that Class Members have meaningful access to HRA programs and services including those of WeCARE; to prevent Class Members from experiencing unnecessary Negative Case Actions; to protect

- 43 -

Class Members from disability-based discrimination; and to enhance the Defendants' ability to promptly identify and take corrective actions with respect to any deficiencies in complying with the Stipulation.

132. The Monitoring Protocol will be primarily based on data available through HRA systems.

133. To the maximum extent practicable, the Monitoring Protocol will be developed such that it can also serve as an internal quality management tool for HRA.

134. In the event that the parties, after good faith negotiations, are unable to reach consensus on the Monitoring Protocol, the matter will be submitted to the Court for resolution.

135. Until the parties agree on a final Monitoring Protocol, the monitoring provisions negotiated in conjunction with the Stipulation so-ordered by the Court on September 19, 2014 (the "Interim Agreement"), will remain in effect unless the parties agree that a particular monitoring provision is no longer relevant.

136. Plaintiffs' counsel shall have reasonable access, upon reasonable notice, to additional information to confirm or supplement information provided pursuant to the Monitoring Protocol and Interim Agreement in order to confirm Defendants' compliance with the terms of this Stipulation. Plaintiffs will request any additional information within a reasonable period before the expiration of this Stipulation.

137. The Monitoring Protocol will specify the monitoring methodologies, as well as the form, content, timing, and frequency of reporting. The initial report generated pursuant to the monitoring protocol cannot form the basis of a motion for enforcement or contempt. However, the parties will meet and confer within 30 days of production of the first Monitoring Report/s to discuss compliance.

## JURISDICTION

138. The provisions of this Stipulation shall not take effect until the Effective Date. Defendant's obligations under this Stipulation shall be in effect during the Effective Period.

139. Except for the remedies to which the Parties have previously agreed as set forth in the Stipulation entered on November 24, 2014 (Dkt. 270), all remedies sought in the Amended Complaint are limited to the provisions of this Stipulation, as well as monitoring compliance with provisions, including the communications monitoring, that the parties have agreed to negotiate in this Stipulation pursuant to paragraphs 130 through 137.

140. The jurisdiction of this Court over the provisions of this Stipulation shall end at the conclusion of forty-eight (48) months following the Effective Date, unless Plaintiffs move for and are granted an extension pursuant to paragraphs 144 through 147 of this Stipulation. When the Court's jurisdiction ends, all rights and claims arising under the provisions of this Stipulation shall terminate; the provisions of this Stipulation shall be deemed satisfied; all claims arising in the Amended Complaint shall be dismissed with prejudice in their entirety; and no further relief in this action shall be sought or granted.

## ENFORCEMENT

141. In the event of a motion by Plaintiffs for enforcement or contempt based upon Defendant's alleged non-compliance with this Stipulation, Defendant shall be considered to be in compliance with the provisions of this Stipulation unless Plaintiffs establish that Defendant's failures or omissions to comply with the provisions of this Stipulation were not minimal or isolated but were sufficiently significant or recurring as to be systemic. Non-systemic individual and isolated violations of this Stipulation shall not form a basis for a finding that Defendant has acted in contempt of this Stipulation or as a basis for a motion for enforcement.

- 45 -

142. During the Effective Period, if Plaintiffs' counsel believes that Defendant has failed to comply, as defined in paragraph 141 above, with the provisions of this Stipulation, Plaintiffs' counsel shall notify Defendant's counsel in writing of the nature and specifics of the alleged failure to comply and shall specify the basis for such belief, including but not limited to any monitoring reports upon which such a belief is based. Such written notice shall be provided at least thirty (30) days before any motion is made for enforcement of this Stipulation or for contempt. Unless otherwise resolved, the Parties' counsel shall meet within this thirty-day period following notice to Defendant's counsel in an attempt to arrive at a resolution of the alleged failure to comply.

143. If no resolution is reached within thirty (30) days from the date of notice, and if the Parties have met pursuant to paragraph 142 above in an attempt to arrive at a resolution of the alleged failure to comply, Plaintiffs may move this Court for an order enforcing the provisions of this Stipulation and/or for contempt. No motion for contempt or enforcement shall be brought to remedy those violations that the Parties agree (a) have been cured or (b) will be cured pursuant to a plan agreed upon by the Parties. In the event that the Parties agree to a plan to cure an alleged violation and Plaintiffs believe that the violation has still not been cured, Plaintiffs must provide at least ten (10) days' notice before any motion is made for enforcement of this Stipulation or for contempt.

## EXTENSION OF THE TERM OF THE STIPULATION

144. Plaintiffs may move this Court for an order extending the jurisdiction of the Court over this Stipulation and shall make any such motion no later than thirty (30) days before the scheduled termination of this Court's jurisdiction, unless another date is agreed upon by the Parties. The Court's jurisdiction shall only be extended over the provision(s) of this Stipulation with which the Court finds Defendant has failed to comply, except that, if the Court determines that a provision or provisions with which Defendant has complied is/are interdependent with a provision or provisions with which

Defendant has failed to comply, the Court shall also, in its discretion, extend its jurisdiction over the interdependent provision(s). The standard for measuring Defendant's compliance with the provisions of this Stipulation for the purposes of a motion to extend this Court's jurisdiction is that set out in paragraph 141 above.

145. Any such extension(s) of the jurisdiction of this Court shall be for a period of not more than one (1) year from the date that the Court's jurisdiction was otherwise scheduled to terminate, unless another date is agreed to by the Parties, except that the Court may extend its jurisdiction for a period greater than one (1) year for good cause shown.

146. Plaintiffs may also move for a further extension of the jurisdiction of the Court beyond any extension granted pursuant to a motion made in accordance with paragraph 144 of this Stipulation, but only after giving Defendant prior notice and an opportunity to address any alleged noncompliance. Such motion for a further extension of this Court's jurisdiction shall also be made in accordance with paragraph 144 of this Stipulation, and any extension granted pursuant to such a motion shall be for a time period that accords with paragraph 145 of this Stipulation.

147. Prior to the expiration of any period of extended jurisdiction (extended pursuant to paragraphs 144 - 146 of this Stipulation), Plaintiffs may move for contempt or enforcement consistent with the provisions set forth in the "Enforcement" section above (paragraphs 141 through 143 of this Stipulation).

## GENERAL PROVISIONS

148. Defendant agrees that Plaintiffs are entitled to reasonable counsel fees and costs as though they are prevailing parties. The Parties agree to attempt to negotiate the amount of such counsel fees and costs. If they are unable to agree on an amount within ninety (90) days of the Effective Date, Plaintiffs may submit an application for counsel fees and costs to the Court, and Defendant reserves the right to respond to such an application in a manner that is consistent with this paragraph.

149. The Parties' Protective Order regarding confidential information, entered by the Court on September 28, 2005, shall remain in effect during the Effective Period of this Stipulation.

150. Nothing contained in this Stipulation shall be deemed to be a finding or an admission that Defendant has in any manner violated Plaintiffs' rights as contained in the constitutions, statutes, ordinances, rules, or regulations of the United States, the State of New York, or the City of New York.

151. This Stipulation shall not be admissible in, nor is it related to, any other proceeding.

152. In the event of any change in federal statute or regulation or state statute or regulation that any party believes changes his or her responsibilities pursuant to this Stipulation, such party shall so notify all other parties and the Parties shall attempt to come to an agreement as to any modifications of this Stipulation that are warranted by said changes in federal or state law. If, after thirty (30) days, the Parties have not been able to agree, the dispute shall be submitted to the Court by motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure by the party seeking to modify the Stipulation. Thirty (30) days after filing such motion, Defendant shall be permitted to implement the modification pending the Court's decision on the motion unless the Court has ordered a stay of such implementation pending its decision or the Court permits Defendant to implement earlier. The filing by Plaintiffs of an appeal of an adverse decision shall not operate as a stay of Defendant's right to implement the proposed modification without further order of the District Court or the Court of Appeals.

153. Without diminishing the right of Plaintiffs to seek enforcement of this Stipulation, HRA will provide Plaintiffs' counsel with a mechanism to notify the Agency in writing of complaints regarding the individual cases in which HRA allegedly violated the terms of this Stipulation. HRA will investigate the alleged incident(s), take any appropriate steps required to resolve the issue(s) concerning each individual case (including issuing benefits to eligible applicants and recipients, withdrawing inappropriate Negative Case Actions, and providing RAs as specified in this Stipulation),

and report the results of such investigation, including what steps, if any, were taken to resolve the issue(s), in writing to Plaintiffs' counsel. Such report shall be provided within five (5) business days of receiving Plaintiffs' counsel's report of the alleged incident(s) or in time to meet a deadline or avert and/or abate an emergency.

154. No provision in this Settlement shall infringe upon any individual Class Member's right to request a fair hearing concerning that individual's Cash Assistance, SNAP, or Medicaid benefits, to seek judicial review of the fair hearing decision, or to appeal or challenge an RA determination.

155. All written notifications sent pursuant to this Stipulation and all other correspondence concerning this Stipulation shall be sent by electronic mail or facsimile to the following addresses or to such other address as the recipient named below shall specify by notice in writing:

> <u>To Plaintiffs' counsel</u>
> Kathleen M. Kelleher
> Susan E. Welber
> Kenneth R. Stephens
> The Legal Aid Society
> Law Reform Unit
> Civil Practice
> 199 Water Street, 3rd Floor
> New York, NY 10038
> Fax: (212) 509-8941
> Email:      kkelleher@legal-aid.org
>                 sewelber@legal-aid.org
>                 KStephens@legal-aid.org

> <u>To Defendant's counsel</u>
> D. Alan Rosinus
> New York City Law Department
> 100 Church Street
> New York, NY 10007
> arosinus@law.nyc.gov

Fax: (212) 788-0877

156.   Any party may change its designated addressee(s) or address(es) by written notice to the other parties.

157.   This Stipulation is final and binding upon the Parties, their successors, and their assigns.

Dated: March 10, 2015
New York, New York

SEYMOUR JAMES
Attorney-in-Charge
THE LEGAL AID SOCIETY ·
Adriene Holder
Attorney-in-Charge, Civil Practice
Judith Goldiner
Attorney-in-Charge, Civil Law Reform Unit
Ken Stephens, Supervising Attorney, Civil
Law Reform Unit
Susan E. Welber, Staff Attorney
Attorneys for Plaintiffs
199 Water Street, 3rd Floor
New York, NY 10038
(212) 577-3307
kkelleher@legal-aid.org

ZACHARY W. CARTER
Corporation Counsel of the
City of New York
100 Church Street
New York, New York 10007
(212) 356-0877
arosinus@law.nyc.gov

By: _____
Kathleen M. Kelleher

By: _____
David Alan Rosinus, Jr.
Assistant Corporation Counsel

*Attorney for Defendant*

Sean M. Murphy
Andrea Hood
Sarah L. Rothenberg
MILBANK TWEED HADLEY & McCLOY
LLP
One Chase Manhattan Plaza
New York, New York 10005
smurphy@milbank.com
Tel.: (212) 530-5000

By: _____
Sean M. Murphy

*Attorneys for Plaintiffs*

So Ordered this _____ day of _____, 2015

_____
Katherine B. Forrest, United States District Court Judge